FILED

2009 Nov-04  AM 11:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Southern Division

### CASE NO.:

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| CHARLES E. LECROY AND DOUGLAS W. MACFADDIN, | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

## I. INTRODUCTION

1.     This case involves payments arranged by two managing directors of a national broker-dealer to friends of Jefferson County, Alabama public officials so the broker-dealer and its affiliated commercial bank could obtain $5 billion in County bond underwriting and interest rate swap agreement business.

2.     Charles LeCroy and Douglas MacFaddin, the two former managing directors, privately agreed with certain County commissioners to pay more than $8.2 million in 2002 and 2003 to close friends of the commissioners who either

owned or worked at local broker-dealers.

3. Although labeled as payments for work on the transactions, their true purpose was to ensure that County officials selected the broker-dealer, J.P. Morgan Securities Inc., as County bond underwriter, and the bank, JPMorgan Chase Bank, N.A., as County swap provider. The broker-dealers whom LeCroy and MacFaddin arranged to pay had no official role in the transactions and performed few, if any services, despite receiving hefty fees that in many cases dwarfed those paid to other third parties such as lawyers and bankers who advised the County and worked extensively on the deals.

4. In taped telephone conversations, LeCroy and MacFaddin demonstrated they knew these payments were sham transactions designed to get the broker-dealer and the bank (together "JPMorgan") business, referring to them as "payoffs," "giving away free money," and "the price of doing business."

5. Despite this knowledge, LeCroy and MacFaddin did not disclose any of the payments or the conflicts of interest the agreements with individual commissioners raised, either to the County or investors in the bond offerings, or to the County in the swap agreements.

6. In connection with these payments, the County selected JPMorgan to serve as managing underwriter and swap provider for the largest municipal auction rate securities and swap agreement transactions in JPMorgan's history. JPMorgan

incorporated the costs of these payments into higher swap interest rates it charged the County, directly increasing the swap transaction costs to the County and its taxpayers.

7.    This course of conduct operated as a fraud and deceit on the County and investors by depriving them of an objective and impartial bond underwriting process and swap agreement negotiations.  By engaging in this conduct, LeCroy and MacFaddin violated Section 17(a) of the Securities Act of 1933 ("Securities Act"); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5; and Section 15B(c)(1) of the Exchange Act and Municipal Securities Rulemaking Board ("MSRB") Rules G-17 and G-20.  Unless the Court enjoins them, they are reasonably likely to continue to violate the federal securities laws.

## II.  DEFENDANTS AND RELATED ENTITIES

### A.  Defendants

8.    LeCroy, 55, of Winter Park, Florida, joined J.P. Morgan Securities as a vice president in March 1999.  He was subsequently promoted to managing director of J.P. Morgan Securities' Southeast Regional office in Orlando.  As such, he was responsible for J.P. Morgan Securities' entire municipal bond business in the firm's Southeast Region.  LeCroy left the firm in March 2004.  He held Series 7, 24, 53 and 63 securities licenses.  In January 2005, LeCroy pled guilty to two

counts of wire fraud for engaging in a scheme to make payments to obtain municipal bond business from the city of Philadelphia, Pennsylvania on behalf of JPMorgan, and was sentenced to six months in prison.

9.       MacFaddin, 48, of Cos Cob, Connecticut, served as managing director and head of J.P. Morgan Securities' Municipal Derivatives Department from 2001 until March 2008.  As such, he supervised the firm's entire municipal derivatives operations, including those people responsible for negotiating all swap agreements JPMorgan Chase Bank entered into with governmental agencies.  MacFaddin holds Series 7, 24, 53 and 63 securities licenses.

### B.  Related Entities

10.       J.P. Morgan Securities is a Delaware corporation with its principal place of business in New York, New York.  J.P. Morgan Securities has been registered with the Commission as a broker-dealer since 1985 and is also a registered municipal securities broker-dealer.  From 2001 to 2003, J.P. Morgan Securities managed or co-managed seven County sewer bond underwritings, of which three are at issue in this complaint.

11.       JPMorgan Chase Bank is a national banking association with U.S. branches in 17 states.  From 2001 to 2003, JPMorgan Chase Bank entered into eight interest rate swap agreements with the County, of which three are at issue in this complaint.

4

### III. JURISDICTION AND VENUE

12.     This complaint concerns conduct, fees, and payments in connection with three County bond offerings and three security-based swap agreements between October 2002 and November 2003.

13.     The three bond offerings, with a total value of about $3 billion, are: (1) an $839 million sewer bond offering that closed on October 24, 2002 ("the 2002-C bonds"); (2) a $1.1 billion sewer bond offering that closed on May 1, 2003 ("the 2003-B bonds"); and (3) a $1.05 billion sewer bond offering that closed on August 7, 2003 ("the 2003-C bonds").

14.     The three County swap agreements, with a total value of about $2 billion, are: (1) a $1.1 billion swap agreement with JPMorgan Chase Bank executed in connection with the 2003-B bonds ("the 2003-B swap agreement"); (2) a $789 million swap agreement with JPMorgan Chase Bank executed in connection with the 2003-C bonds ("the 2003-C swap agreement"); and (3) a $111 million swap agreement with JPMorgan Chase Bank executed on November 7, 2003 with an effective date of May 1, 2004 ("the November 2003 swap agreement").

15.     The Court has jurisdiction over conduct involving these transactions and this action pursuant to Sections 2(a)(1), 17(a), 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77b(a)(1), 77q(a), 77t(b), 77t(d), and 77v(a); and

Sections 3(a)(10), 10(b) 15B(c), 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78c(a)(10), 78j(10), 78o-4(c), 78u(d), 78u(e), and 78aa.

16.    More specifically, the Court has jurisdiction over the three bond offerings and fraudulent conduct in connection with them because bonds are included in the definition of the term "security" in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

17.    The Court also has jurisdiction over the fraudulent conduct in connection with the three swap agreements because they were security-based swap agreements. Security-based swap agreements are defined in Section 206B of the Gramm-Leach-Bliley Act, as amended by the Commodity Futures Modernization Act of 2000, as agreements "of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein."

18.    The terms of the 2003-B and 2003-C swap agreements stated the County was entitled to receive floating interest rate payments from JPMorgan Chase Bank based in part on the value of the Bond Market Association's ("BMA") Municipal Swap Index, an index of securities used to establish the floating rate yield (the Bond Market Association is now known as the Securities Industry and Financial Markets Association).

19.    Furthermore, the November 2003 swap agreement specified the

County had to make interest rate payments to JPMorgan Chase Bank based on the floating value of the BMA's Municipal Swap Index. Thus, all three transactions constituted security-based swap agreements because a material term in each agreement was based on "the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein."

20.     The express terms of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 (among other statutes and rules) give the Commission the authority to prosecute anti-fraud violations of those sections in connection with security-based swap agreements.

21.     An additional basis for the Court's jurisdiction over fraudulent conduct in connection with the 2003-B and 2003-C swap agreements is that the County negotiated, executed, and entered into these two swap agreements simultaneously with and as part of the 2003-B and 2003-C bond offerings. The fraudulent conduct involving the swap agreements was therefore part of the bond offerings over which the Court already has jurisdiction.

22.     The Court has personal jurisdiction over the Defendants and venue is proper in the Northern District of Alabama because: (1) LeCroy and MacFaddin negotiated the terms of the bond offering documents and swap agreements at issue with or in the County, which is located in the Northern District of Alabama; and (2) they solicited business from and transacted business with the County, both in

person and through numerous telephone calls, letters, and e-mails to and from County commissioners and employees, as well as to and from private law firms, investment banks, and broker-dealers located in the County.

23.   For example, MacFaddin and LeCroy were members of the working group on all of the bond offerings and swap agreements, meaning they sent and received, at a minimum, dozens of e-mails on each transaction, all of which also included County officials as well as advisors to the County located in the Northern District.   The two also participated in conference calls regarding each transaction that included County officials and advisors.   As discussed in more detail below, LeCroy made numerous trips to the County in connection with the transactions.

24.   The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this complaint.

## IV. FACTS

### A.  County Sewer Bond Offerings And Swap Agreements

25.   Jefferson County's sewer revenue bond offerings began in the 1990s pursuant to a consent decree with the U.S. Environmental Protection Agency and the U.S. Department of Justice to renovate the County's sewer system.   To help

fund the improvements, the County commission approved issuing more than $3 billion in auction, variable and fixed interest rate bonds between 2001 and 2003. J.P. Morgan Securities served as lead underwriter for the majority of the auction and variable rate debt.

26.    In connection with the bond offerings, the County entered into 18 swap agreements, with a notional amount of $5.6 billion.  A swap agreement is an agreement between two parties to exchange interest payments on a specified principal amount (referred to as the notional amount) for a specified period of time. JPMorgan Chase Bank served as the largest provider for swap agreements conducted in 2002 and 2003.

### B.  The Undisclosed Payments Begin

27.    The plan to pay for County business started in 2002, when LeCroy, JPMorgan's lead investment banker for the County's public finance projects, approached his superiors in March 2002 with a new strategy to earn the County's sewer bond business.

28.    In a series of e-mails, LeCroy discussed a rival firm's purportedly successful tactic to win municipal finance business of paying small local firms in unrelated transactions to enlist those firms' "political support" for the County hiring the rival firm on bond and swap transactions.

29.    To help JPMorgan win the County's business, LeCroy in the e-mails

suggested paying two small local broker-dealers, Gardnyr Michael Capital and ABI Capital Management. LeCroy wrote his bosses that "each have a close relationship with a commissioner in Jefferson County" and can be "helpful to us in Jefferson." LeCroy estimated the typical payments would be $5,000 to $25,000 per deal. One of LeCroy's superiors reacted favorably, and suggested following up to "know which firms [LeCroy] wants us to target." At the same time, JPMorgan's Tax-Exempt Derivatives group was also soliciting interest rate swap deals with the County.

30.  As discussed in more detail throughout the rest of this Complaint, LeCroy and MacFaddin embarked on a strategy to pay local firms whose principals or employees were close friends of certain County commissioners, but that were unable to participate as auction rate underwriters, or as swap providers under Alabama law. The payments, which LeCroy, MacFaddin and JPMorgan never disclosed to the County or investors, were to help win County bond underwriting and swap agreement business. Far from the $5,000 to $25,000 originally discussed, the payments wound·up running into the millions of dollars and cost the County because JPMorgan incorporated many of them into the cost of the swap transactions, even though LeCroy and MacFaddin knew these firms performed virtually no services for the County.

31.  The scheme began in earnest in July 2002, when LeCroy and

MacFaddin solicited the County on behalf of J.P. Morgan Securities for a $1.4 billion sewer bond deal.    LeCroy and MacFaddin knew several County commissioners wanted to complete the transaction before November, when two commissioners would leave office and would lose their ability to funnel payments to their supporters' firms.    As a result, LeCroy and MacFaddin targeted their solicitations to Commissioner Jeff Germany and another commissioner, both of whom had lost their primary elections and would leave office in November.

32.    On July 11, 2002, Germany and the County commission voted to approve a $1.4 billion financing plan and selected J.P. Morgan Securities to serve as lead underwriter.    A few days later, on July 15, LeCroy told MacFaddin in a taped telephone conversation about his efforts to persuade the two commissioners to select J.P. Morgan Securities for the deal.    He boasted of beating out a rival firm with the new strategy:

> And we kind of co-opted their – the minority firms they teamed up with because, the two black commissioners [Commissioner Germany and another commissioner] said, "Look if we support the synthetic refunding, you guys have to take care of our two firms [Gardnyr Michael and ABI Capital]."    And I said, "Whatever you want – if that's what you need, that's what you get – just tell us how much." . . . And I've been told by the other four [commission] members now that if I don't get it done by November 1 they're gonna fire [me] because they want it done before they lose control, because they want to help all their friends.

33.    The County later increased the total sewer bond deal to $1.8 billion, but broke it up into three smaller transactions – the 2002-B, 2002-C, and 2002-D

deals – all of which closed within a five-week period ending on November 1, 2002.

34.     The largest of the three transactions, the $839 million 2002-C deal, used a combination of auction rate bonds and interest rate swap agreements. Although the County selected Gardnyr Michael and ABI Capital to serve as co-underwriters with J.P. Morgan Securities on the 2002-B and 2002-D sewer bond offerings, neither firm had the ability to underwrite the 2002-C auction rate bonds or serve as an interest rate swap provider under Alabama law.  That law requires swap agreement counterparties to either (1) have a net worth of at least $100 million, or (2) arrange for a person or entity with a net worth of at least $100 million to guarantee their obligations.

35.     Nevertheless LeCroy and MacFaddin made sure JPMorgan paid Gardnyr Michael and ABI Capital on this transaction.  On October 28, 2002, five days after the 2002-C bond offering closed and JPMorgan Chase Bank had executed a swap agreement with the County, LeCroy and MacFaddin discussed in tape recorded telephone conversations that they had agreed with Germany to pay $250,000 each to Gardnyr Michael and ABI Capital for the 2002-C transaction.

36.     MacFaddin expressed concern that if someone discovered the payments "they could have a field day with it" because the payments were "fairly large."   LeCroy allayed MacFaddin's fears by stating that other County commissioners "didn't have a clue" about the payments.

37.     Five days earlier, on October 23, 2002, Germany and the rest of the commission had approved a resolution authorizing issuance of the 2002-C bonds, with J.P. Morgan Securities serving as lead underwriter. The County resolution further authorized the underwriters to prepare and distribute an official statement for the 2002-C bonds. The bond offering closed the following day.

38.     While the resolution specifically listed the underwriters, swap providers, swap advisor and remarketing agents selected to serve on the 2002-C bond offering and simultaneous swap agreement, it made no mention of Gardnyr Michael or ABI Capital.

39.     Furthermore, the official statement for the 2002-C bonds disclosed the roles of numerous deal participants, including the underwriters, underwriters' counsel, bond counsel, structuring agent, and the County's financial and swap advisors. The official statement also discussed the terms of JPMorgan Chase Bank's swap agreement with the County (which MacFaddin subsequently executed on behalf of the bank). In addition, it listed underwriting fees paid to J.P. Morgan Securities ($1.5 million) and its two co-underwriters ($644,370 and $774,484). However, the official statement did not disclose the payments to ABI Capital and Gardnyr Michael.

40.     In its role as managing underwriter, J.P. Morgan Securities offered and sold the 2002-C bonds to investors. In doing so, J.P. Morgan Securities

transmitted the official statement to investors.   The official statement did not disclose to bond investors the material information concerning the payments to ABI Capital and Gardnyr Michael, or the conflict of interest raised by the agreement to make the payments to secure JPMorgan's selection as managing underwriter and swap provider.

41.   On October 30, 2002, to receive its payment, Gardnyr Michael submitted a one-line, $250,000 invoice to JPMorgan describing its role as "Co-Manager on Jefferson County, Alabama Swap."  In a taped telephone call, LeCroy and MacFaddin discussed their mutual concern over the way Gardnyr Michael had worded the invoice because it made it sound like the firm had done work on the swap transaction.

42.   The two agreed to re-draft the invoice because, as MacFaddin said, it contained "fairly flawed language."  But they struggled for several minutes over how to characterize the $250,000 payment because Gardnyr Michael had not done any work on the transaction.   MacFaddin indicated Gardnyr Michel was not "running much risk" on the deal.  The following conversation ensued:

> MacFaddin: Now we have, what was termed a swap adviser.
> LeCroy:      Yeah, we had a swap adviser.
> MacFaddin: And we had a structuring agent.
> LeCroy:      And we had a structuring agent.
> MacFaddin: Right.  So we've got to be careful there because he was
>                    neither of those.

LeCroy:      Right, exactly.

MacFaddin:   He was a broker dealer that did not participate in an underwriting because it went from fixed rate to floating rate.

LeCroy:      Can we put – I mean would swap advisory, I mean an advisor to us, swap advisory services?  Um swap –

MacFaddin:   Well, I want to be careful about describing him as a swap advisor.   I'd rather just, you know, term something related or associated with the swap versus advisor –

LeCroy:      Advisor.

MacFaddin:   Because in the end, he really didn't advise us on the swap.

LeCroy:      Right.

MacFaddin:   Or the structure.

LeCroy:      Right.

MacFaddin:   Or anything like that.

43.    Finally, MacFaddin concluded that "what we're saying is, it's really Jeff Germany who is directing us to pay these guys.  It's not, we're not paying them because they were our advisor."  MacFaddin then asked LeCroy if the firm actually advised Germany, to which LeCroy responded, "I have no idea."

44.    LeCroy and MacFaddin re-crafted Gardnyr Michael's invoice to conceal the firm's lack of participation in the transaction by using the language "Directed Fee Payment Pursuant to Instructions from Commissioner Jeff Germany related to the Interest Rate Swap executed between JP Morgan and Jefferson County as part of the Series 2002-C Revenue Refunding Warrants."  Gardnyr Michael and ABI Capital immediately submitted new invoices, each using this

exact language. Other invoices would later use this same "Directed Fee Payment" language to describe subsequent undisclosed payments.

45. During the first week of November 2002, JPMorgan sent wire transfers to Gardnyr Michael and ABI Capital totaling $500,000, an amount equal to one-third of the $1.5 million underwriting fee J.P. Morgan Securities received for the transaction. The $250,000 payments to Gardnyr Michael and ABI Capital were larger than the underwriting fees either firm earned on the 2002-B or 2002-D transactions. Shortly thereafter, Gardnyr Michael wired $200,000 to a firm consultant who was a longtime friend of Germany's and a contributor to his failed re-election campaign. ABI Capital paid $111,750 to one of its consultants, also a long-time friend of Germany and a campaign contributor.

## C. The 2003-B Bonds And Swap Agreement

46. In November 2002, Larry Langford became president of the County commission and head of the commission's finance committee that had significant authority over approval of County bond deals and swap agreements. Early in his administration, Langford made it clear to the County's financial advisor that he wanted William Blount, head of the Montgomery broker-dealer Blount Parrish & Co., involved in every County financing transaction. Langford and Blount were long-time friends and political colleagues.

47. Prior to Langford involving Blount in County bond and swap deals,

Blount Parrish had not received any County business from 1997 through 2002. However, Langford was able to ensure Blount's selection because his positions as commission president and head of the finance committee effectively allowed him to control the selection process for underwriters and swap providers.

48.    From January until May 1, 2003, LeCroy and MacFaddin actively solicited the County, and Langford in particular, to hire JPMorgan as underwriter on a new a sewer bond offering and to enter into another swap agreement.  During that period, LeCroy met several times in the County with Langford and/or Blount regarding a potential bond offering and swap agreement that became the 2003-B transaction.  Because Blount Parrish could not serve as a swap provider under Alabama's net capital requirements, Blount solicited Langford to select Goldman Sachs Capital Markets Inc. to participate in the 2003-B swap transaction because Blount Parrish had a consulting agreement with Goldman Sachs.

49.    Goldman Sachs and another firm, Rice Financial Products Co., a New York-based broker-dealer, were also pitching swap deals to the County.  Rice Financial had recently hired a local consultant who was close to Langford.  To prevent Goldman Sachs or Rice Financial from executing their own swap transactions with the County and ensure the County selected JPMorgan Chase Bank as the swap provider, LeCroy and MacFaddin negotiated with Langford for JPMorgan to make payments to those two firms.

50.    On February 25, 2003, Langford and the County commission approved a resolution authorizing the $1.1 billion 2003-B bond offering, with J.P. Morgan Securities serving as lead underwriter and JPMorgan Chase Bank serving as swap provider for the corresponding $1.1 billion swap agreement.  The County approved a second resolution with more details on March 27, 2003.  That swap agreement was executed on March 28, 2003, with an effective date of May 1, 2003 to coincide with the bond offering.

51.    In presentations and reports sent to the County and bond ratings agencies, JPMorgan represented the bond offering and swap agreement as one "finance plan" with a combined auction rate bond offering and swap agreement. Furthermore, the 2003-B bond offering official statement described the details of both the offering and the swap agreement, and stated the County entered into the swap agreement "in connection with the issuance of the 2003-B" bonds.  It also stated that JPMorgan Chase Bank's variable interest rate payments to the County under the swap agreement were intended to approximate the interest rate the County paid to bond investors in the auction market.

52.    In connection with the bond deal and swap agreement, LeCroy and MacFaddin agreed in negotiations with Langford to pay Goldman Sachs $3 million, and Rice Financial $1.4 million.  In turn, Goldman Sachs agreed to pay Blount Parrish, its consultant, $300,000.

53.    To justify these payments, MacFaddin and LeCroy attempted to create a role for both Goldman Sachs and Rice Financial in the 2003-B swap transaction. Yet neither firm entered into a swap agreement with the County, or served as an advisor to the County on this transaction. JPMorgan wired a $1.4 million payment to Rice Financial and paid $3 million to Goldman Sachs through a separate swap agreement between Goldman Sachs and JPMorgan Chase Bank created solely as a mechanism to make this payment. LeCroy later joked with MacFaddin in another call about JPMorgan's "philanthropic work" by "giving a charitable donation to Goldman" for "taking no risk."

54.    None of the official documents related to the bond offering or the swap agreement disclosed the payments from JPMorgan to Goldman Sachs and Rice Financial, or the payment from Goldman Sachs to Blount Parrish. For example, the February 25 County resolution listed the bond underwriter, swap provider, County financial advisor, bond counsel, and underwriter's counsel selected to serve on the 2003-B transaction. It did not mention Goldman Sachs, Rice Financial or Blount Parrish, all of whom Langford had directed JPMorgan to pay. Similarly, neither did the March 27 resolution.

55.    The bond offering official statement listed and defined the identities and roles of numerous deal participants, including the underwriters, bond counsel, underwriters' counsel, and the County's financial advisor. It further disclosed

underwriting fees of $4.5 million to J.P. Morgan Securities and $681,401 to a co-underwriter. But it did not mention the three firms receiving payments.

56.    In its role as managing underwriter, J.P. Morgan Securities offered and sold the 2003-B bonds to investors. In doing so, J.P. Morgan Securities transmitted the official statement to investors. The official statement did not disclose to bond investors the material information concerning the payment scheme or the conflict of interest raised by the agreement with Langford to pay $4.4 million to firms on Langford's behalf to secure County business.

57.    JPMorgan created and finalized the swap agreement confirmation, which Langford signed on behalf of the County. The agreement stated the County was to receive floating interest rate payments from JPMorgan Chase Bank based in part on the BMA Municipal Swap Index. The County was to make fixed rate payments to JPMorgan Chase Bank. The confirmation contained an itemized fee section that listed three fees JPMorgan Chase Bank was paying at the County's direction: (1) $165,000 to the County's swap advisor; (2) $250,000 to the County's legal advisor; and (3) $50,000 to the County's financial advisor. However, omitted from the confirmation was the $3 million payment to Goldman Sachs and the $1.4 million payment to Rice Financial.

58.    Instead, MacFaddin set forth the payments only in a separate "side letter" he sent solely to Langford (that Langford countersigned) on March 28, 2003

– after the swap agreement had been executed.  In the letter, MacFaddin stated that "the County has requested, as a condition to entering into the Transaction with JPMorgan" that JPMorgan include Goldman Sachs and Rice Financial "in the Transaction, directly or indirectly, such that Goldman and Rice Financial receive a specified percentage of JPMorgan's net economic benefit from the Transaction."

59.    The letter did not describe any services that Goldman Sachs or Rice Financial performed on the 2003-B deal, and went on to note that neither Goldman Sachs nor Rice Financial had entered into a specified type of swap agreement with the County "that would permit their direct participation in the Transaction."

60.    While LeCroy and MacFaddin knew the only reason Langford had required JPMorgan to pay Goldman Sachs was so Blount Parrish could receive a fee, MacFaddin omitted any reference in this side letter to that fee or Blount Parrish's fee.

61.    Goldman Sachs, however, wrote separately to Langford about Blount Parrish's payment.  In a letter also dated March 28, 2003, Goldman Sachs wrote that it was paying "consulting fees" to Blount Parrish, as well as another broker-dealer.  Goldman Sachs went on to "recommend that such payment of fees be made known to bond counsel for the refunding bonds to be issued so that counsel can determine whether such payments should be included in the refunding bond offering documents."

62.     However, neither Langford nor LeCroy, MacFaddin or anyone else at JPMorgan ever made such a disclosure to bond counsel or any other county officials working on the bond offering.

### D. The 2003-C Bonds And Swap Agreement

63.     The day the 2003-B bond transaction closed, LeCroy had dinner with Langford in Birmingham, during which he solicited a new bond and swap transaction. The next day, May 2, 2003, LeCroy called MacFaddin and told him Langford responded "Let's go for it."  However, LeCroy told MacFaddin that Langford had specific requirements for JPMorgan to win the County's business:

LeCroy:       This time the advice we're getting is to get with Bill Blount early, bring him in by bringing him on our team, so he doesn't go to a competitor. So, "Larry," I said –

MacFaddin: That sounds fine.

LeCroy:       – I said, "Commissioner Langford, I'll do that because that's your suggestion, but you gotta help us keep him under control. Because when you give that guy a hand, he takes your arm." You know?

MacFaddin: [Laughing] Yeah, you end up in the wood-chipper.

LeCroy:       Yeah, that's right. So he said, "Don't worry, I can control him. Just get him on board." And he says he might have a couple of other little local minority firms to take care of, but he said, "Let's see if we can get it done."

64.     Later the same day in a conversation with a J.P. Morgan Securities associate ("the Associate"), LeCroy again discussed how he would ensure JPMorgan's participation: "You know, Goldman is out, but I'll have to deal with

Bill Blount somehow.  I think what we're going to do is approach him and try to get him on our team and get him to agree to some kind of monetary compensation up front, so he doesn't go out and represent one of our competitors."

65.    MacFaddin was also instrumental in carrying out the strategy on this deal.  On April 22, 2003, MacFaddin called Blount and invited him to a dinner meeting in New York City, at which they discussed the strategy to pay Blount Parrish to influence Langford to award County bond and swap business to JPMorgan.  In a taped telephone call a month later with a derivatives marketer working on the deal, MacFaddin said that Blount's specific role in the transaction was to get JPMorgan "to the table through Langford."

66.    Blount quickly produced results for LeCroy and MacFaddin. Numerous tape recorded conversations, e-mails and even entries in Langford's business calendar show multiple meetings in the County in May and June 2003 between Langford, LeCroy and Blount concerning the $1.05 billion 2003-C sewer bond offering and the corresponding $789 million swap agreement.  This included a meeting in Langford's office to discuss the 2003-C deal on June 11, 2003.

67.    A week before the meeting, LeCroy had a telling conversation with the Associate about his plans for securing the deal:

LeCroy:    I got to get the politics lined up.  And, of course, we have to pick the partners who are going to get free money from us this time.

Associate:  Yes, exactly, because we like to do that.

LeCroy:     That's right [laughing].

Associate:  We like to give money away.

LeCroy:     That's right, that's right. Oh yeah. Who's in line for the
            freebies this time?

68.     The day of the June 11 meeting, LeCroy told the Associate that he
was "pretty sure" Langford would approve of JPMorgan handling the 2003-C
transaction. He then went on to add that "at some point, we'll have to figure out
who we have to pay off. I think instead of Goldman we'll have, we'll probably
have someone like Bill Blount . . . who gets a percentage of the swap."

69.     In the same conversation, LeCroy described a meeting he had with
Blount in Birmingham on the evening of June 10, in which Blount was insisting on
being paid 15 percent of JPMorgan's fees on the 2003-C swap. The Associate
expressed disbelief:

Associate:  How does he get 15%? For doing what?

LeCroy:     For, basically, his role in this deal –

Associate:  For not messing with us?

LeCroy:     – not messing with us and, I said [to Blount], look the
            only way I'm willing to even entertain this is if you're
            successful in keeping every other firm out of this deal.
            That's right. I said, so, because you know, we've got a
            lot more latitude dealing with him than Goldman Sachs.
            And I've got to pay him some on the bonds. But, it's a
            lot of money, but in the end it's worth it on a billion-
            dollar deal.

70.   A week after the meeting, on June 18, 2003, LeCroy called the Associate to confirm that JPMorgan would pay the firms Langford wanted to secure the County's 2003-C deal:

LeCroy:   We've cut our deals with the locals as the County has directed us to, that's all done. I got that done up front this time, to avoid Goldman Sachs and anybody like that coming in. B of A made a run at it yesterday, and I was able to get the Commissioner [Langford] to cancel the meeting. So I think we can hold them off. But that's gonna cost us, from the swap side about, oh – it's gonna cost us – all in about $3.5 million, but part of that's coming out of the bonds . . .

Associate: You mean in fees that we're going to have to pay people?

LeCroy:   That's right, yeah. Now, compared to last time, it's a lot less when you add Goldman and Rice together . . . I just want you to be aware that when you're in there negotiating, that we've got deals cut, pursuant to the Commissioner's direction with, you know, the Bill Blounts of the world, and so we've got to honor them.

71.   Ultimately, as discussed in more detail below, LeCroy and MacFaddin arranged for JPMorgan to pay Blount Parrish $2.6 million – more than any other participant in the transaction made except JPMorgan itself – for ensuring JPMorgan was selected as underwriter and swap provider. But Langford was not the only County commissioner whose support LeCroy and MacFaddin sought. They also arranged for JPMorgan to pay $250,000 each to Gardnyr Michael and ABI Capital to influence the vote of Commissioner Sheila Smoot. Both firms had hired as a "consultant" a long-time friend of Smoot.

72.     Furthermore, on July 26, 2003, LeCroy and MacFaddin arranged for JPMorgan to spend $1,122 for a spa trip in New York City for Commissioner Mary Buckelew, who sat on the commission's finance committee with Langford.   Two taped telephone conversations in July 2003, each with the Associate, show both MacFaddin and LeCroy approved JPMorgan paying for the full spa cost, which was charged to the Associate's credit card.   LeCroy told the Associate to conceal the charge by not itemizing it as a County expense on JPMorgan's expense reports, in case a reporter asked for JPMorgan's records.

73.     The strategy worked again.   The County commission voted to approve a resolution on July 1, 2003 that authorized the issuance of $1.05 billion in bonds, with J.P. Morgan Securities serving as lead underwriter.   The bond offering closed on August 7, 2003.   The resolution also authorized a swap transaction "in connection with" the offering, which turned into a $789 million swap agreement with JPMorgan Chase Bank that the parties executed on July 14, 2003.   The effective date of the swap agreement coincided with the 2003-C bond offering closing date.

74.     The 2003-C bond offering and swap agreement were one deal.   The 2003-C official statement J.P. Morgan Securities sent to investors described both the bond offering and the swap agreement as part of the financing plan.   It stated that "In connection with the issuance of the 2003-C Warrants, the County has

entered into an interest rate swap agreement with JP Morgan." The official statement also stated that JPMorgan Chase Bank's variable interest rate payments to the County under the swap agreement were intended to approximate the interest rate the County paid to bond investors in the auction market.

75.    Once again, the official documents or conversations related to this transaction did not disclose the payments to Blount Parrish, Gardnyr Michael, and ABI Capital.  For example, the July 1 County resolution specifically listed the underwriters, swap providers, County advisors, legal counsel and remarketing agents selected to serve on the 2003-C bond offering and swap agreement, but did not mention the three firms LeCroy and MacFaddin had arranged for JPMorgan to pay to win commission votes.  Other commissioners did not know Blount Parrish was participating in the transaction before they voted on the resolution.

76.    The bond offering official statement also listed the roles of all participants the County had selected, including the underwriters, bond counsel, the underwriters' counsel and the County's financial advisor.  It disclosed J.P. Morgan Securities' $3.9 million underwriting fee, a $1.3 million co-underwriting fee to Bank of America, and Bank of America's payment to a third-party broker-dealer acting as a remarketing agent.  But the official statement omitted Blount Parrish's $2.6 million payment and the $250,000 payments to the other two firms.

77.    In its role as managing underwriter, J.P. Morgan Securities offered

and sold the 2003-C bonds to investors. In doing so, it transmitted the official statement to investors. The official statement did not disclose to bond investors the material information concerning the payment scheme and the conflict of interest raised by the agreements with Langford and Smoot to pay $3.1 million to firms on their behalf to influence JPMorgan's selection as managing underwriter and swap provider.

78.    The 2003-C swap agreement stated the County was to receive floating interest rate payments from JPMorgan Chase Bank based in part on the value of the BMA Municipal Swap Index, while the County was to make fixed interest rate payments to JPMorgan Chase Bank. The swap agreement confirmation, dated July 14, 2003, did not disclose the fees. It contained an itemized fee section listing payments JPMorgan was making to the County's swap advisor ($363,750), legal counsel ($187,500), and financial advisor ($37,500), but omitted the Blount Parrish, Gardnyr Michael and ABI Capital payments.

79.    Furthermore, tape-recorded telephone conversations of the July 14 swap agreement closing show LeCroy was explicitly asked about fees, but did not disclose the payments to the three firms. LeCroy attended the closing in Birmingham, along with numerous County managers and advisors. Appearing by telephone from New York, the Associate reviewed the material terms of the swap confirmation and concluded by listing the swap advisor, legal counsel, and

financial advisor fees.  She then said, "Is that correct?  Do we have any additional fees that I'm not taking into account that I need to be aware of?"  After a brief silence, LeCroy responded: "No.  No one is nodding 'yes' so I think we're done."

80.    Yet just two hours after that call, LeCroy called the Associate while boarding a plane to tell her he met with Langford outside the swap closing, at which time both confirmed JPMorgan would pay Blount Parrish $2.6 million in connection with the 2003-C transaction.  LeCroy told the Associate that at the same private meeting with Langford, the two had confirmed payments of $150,000 apiece to Gardnyr Michael and ABI Capital.  LeCroy told the Associate "I haven't talked to them – that's just what we're sending them [laughing].  I hope they're happy.  I guess if they're not we'll find out."

81.    Around the same time, the Associate called MacFaddin to tell him how much JPMorgan was going to pay Blount Parrish.  MacFaddin responded it was "understandable," because Blount had a lot more "stroke" than others whom JPMorgan was paying.

82.    One week later, on July 21, 2003, LeCroy again called the Associate, this time to tell her that Smoot had demanded that Gardnyr Michael and ABI Capital get more money.  Although LeCroy said he attempted to dissuade Smoot because it was very difficult to change the amounts "after the fact," he agreed to increase JPMorgan's payments to the two firms to $250,000 each.

83.   In the course of the conversation, LeCroy told the Associate he knew Smoot did not know about the $2.6 million payment to Blount Parrish, and said he had to agree to her request "because you know we're going to need her vote, and we've got to keep her happy.  She's one of the three majority commissioners."  He complained, however, that he would rather contribute to a commissioner's favorite charity than just "handing money to a vote."

84.   Clearly troubled, the Associate replied, "But to just randomly pay off people that have nothing to do with the deal just doesn't sit well."  LeCroy responded, "That's the deal – that's the price of doing business."

85.   Two weeks after the 2003-C swap transaction closed, LeCroy sent a letter only to Langford, listing the payments to Blount Parrish, Gardnyr Michael and ABI Capital, and stating JPMorgan was making them "at the direction of the Commission."  The letter indicated that JPMorgan was making the payments even though "you have noted that certain firms do not have the ability to underwrite, distribute or remarket tax-exempt floating rate securities or participate in providing interest rate swaps."

86.   Significantly, this letter noted that JPMorgan was incorporating the $3.1 million in payments to the three firms "into the price of the interest rate swap at the time of execution."  This reduced the amount of money the County would receive from the transaction.  The letter made no reference to any role or services

the three firms performed.

87.    Based on identical, one-line "Directed Fee Payment" invoices all three firms submitted, JPMorgan wired the payments to the three firms in late July 2003.

### E.  The November 2003 Swap Agreement

88.    Even before the 2003-C transaction closed, LeCroy solicited Langford for another JPMorgan Chase Bank swap deal with the County.  LeCroy told MacFaddin in a July 30, 2003 telephone call that Langford had told him JPMorgan may "have to help out" some local firms.

89.    Again, these efforts proved successful, as on November 7, 2003, JP Morgan Chase Bank and the County executed a $111 million swap agreement with an effective date of May 1, 2004.  Pursuant to the agreement, the County was required to make interest rate payments based on the floating rate of the BMA Index and the bank was required to make payments to the County at a fixed interest rate.

90.    One day before the County and JPMorgan Chase Bank executed this swap agreement, LeCroy told the Associate about his payment negotiations involving Blount and "how much Blount is going to cost" the firm, which he estimated at $150,000 to $200,000.

91.    During the November 7, 2003 closing, which LeCroy attended in Birmingham in person (and which Langford and several County managers and

advisors also attended), the Associate on the phone in New York read through the material terms of the swap confirmation. She included the three specific fees JPMorgan was paying at the County's direction listed in the confirmation – $225,000 to the County's swap advisor, $40,000 to its legal advisor, and $40,000 to its financial advisor.

92.    The Associate then asked, "Is everyone in agreement with the terms?" All attendees, including Langford, announced they agreed with the terms of the swap agreement. Neither LeCroy nor Langford mentioned that JPMorgan had agreed at Langford's direction to pay $225,000 to Blount Parrish and $75,000 to Gardnyr Michael. The swap confirmation also did not mention those payments, or the fact that JPMorgan was incorporating those fees into the pricing of the transaction.

93.    More than two weeks after the transaction closed, LeCroy sent a letter dated November 24, 2003 only to Langford, describing the payments to Blount Parrish and Gardnyr Michael. The letter represented that the County required the payments as a condition for approving the transaction. Moreover, although LeCroy and MacFaddin negotiated these payments with Langford, the letter asserts that "JPMorgan had no involvement in the decision to make such payments [or] the determination of the amounts of such payments." Finally, the letter acknowledges that JPMorgan incorporated these fees into its pricing of the swap transaction.

## V.  CLAIMS FOR RELIEF

## COUNT I

### Fraud In Violation Of Section 17(a)(1) Of The Securities Act

94.    The Commission repeats and realleges Paragraphs 1 through 93 of this Complaint as if fully restated herein.

95.    From at least 2002 through 2003, the Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

96.    By reason of the foregoing, the Defendants directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. §77q(a)(1).

## COUNT II

### Fraud In Violation Of Sections 17(a)(2) And 17(a)(3) Of The Securities Act

97.    The Commission repeats and realleges Paragraphs 1 through 93 of the Complaint as if fully restated herein.

98.    From at least 2002 through 2003, the Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities,

as described in this complaint: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

99.    By reason of the foregoing, the Defendants directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§77q(a)(2) and 77q(a)(3).

## COUNT III

### Fraud In Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5

100.    The Commission repeats and realleges Paragraphs 1 through 96 of the Complaint as if fully restated herein.

101.    From at least 2002 through 2003, the Defendants directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged

in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

102.   By reason of the foregoing, the Defendants directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5.

## COUNT IV

### Violation Of Sections 15B(c)(1) Of The Exchange Act And MSRB Rule G-17

103.   The Commission repeats and realleges Paragraphs 1 through 87 of the Complaint as if fully restated herein.

104.   Section 15B(c)(1) of the Exchange Act, 15 U.S.C. §78o-4(c)(1), makes it unlawful for any broker, dealer or municipal securities dealer to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or to attempt to induce the purchase or sale of any municipal security in contravention of any rule of the MSRB.

105.   Pursuant to Section 15B(b)(2) of the Exchange Act, 15 U.S.C. §78o-4(b)(2), the MSRB proposes and adopts rules governing the conduct of brokers and dealers and municipal securities dealers in connection with municipal securities. Pursuant to Section 21(d)(1) of the Exchange Act, 15 U.S.C. §78u(d)(1), the Commission is charged with enforcing the MSRB rules.

106.  MSRB Rule G-17 requires every broker, dealer and municipal securities dealer, and their associated persons, in the conduct of their municipal securities business, to deal fairly with all persons and not to engage in any deceptive, dishonest or unfair practice.

107.  From at least 2002 through 2003, through the actions set forth in this complaint and in the conduct of J.P. Morgan Securities' municipal securities business, LeCroy and MacFaddin engaged in deceptive, dishonest or unfair practices, and failed to deal fairly with all persons in connection with the 2002-C bonds, the 2003-B bonds and the 2003-C bonds.

108.  From at least 2002 through at least 2003, LeCroy and MacFaddin made use of the mails or means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, municipal securities in contravention of MSRB Rule G-17.

109.  By reason of the foregoing, LeCroy and MacFaddin directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 15B(c)(1) of the Exchange Act, 15 U.S.C. §78o-4(c)(1), and MSRB Rule G-17.

## COUNT V

## Violation Of Section 15b(c)(1) Of The Exchange Act and MSRB Rule G-20

110.   The Commission repeats and realleges Paragraphs 1 through 87 of the Complaint as if fully restated herein.

111.   Section 15B(c)(1) of the Exchange Act, 15 U.S.C. §78o-4(c)(1), makes it unlawful for any broker, dealer or municipal securities dealer to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or to attempt to induce the purchase or sale of any municipal security in contravention of any rule of the MSRB.

112.   Pursuant to Section 15B(b)(2) of the Exchange Act, 15 U.S.C. §78o-4(b)(2), the MSRB proposes and adopts rules governing the conduct of brokers and dealers and municipal securities dealers in connection with municipal securities. Pursuant to Section 21(d)(1) of the Exchange Act, 15 U.S.C. §78u(d)(1), the Commission is charged with enforcing the MSRB rules.

113.   MSRB Rule G-20 makes it unlawful for any municipal securities broker or dealer, and their associated persons, to give or permit to be given, directly or indirectly, any thing or service of value, including gratuities, in excess of $100 per year to a person other than an employee or partner of the municipal securities broker or dealer, where such payments or services relate to the municipal securities activities of the employer of the recipient of the payment or service.

114.   From at least 2002 through 2003, in relation to the municipal securities activities of Jefferson County, LeCroy and MacFaddin directly or indirectly, gave or permitted to be given to County Commissioner Mary Buckelew, things or services of value in excess of $100 per year in connection with the 2003-C bonds.

115.   From at least 2002 through 2003, LeCroy and MacFaddin made use of the mails or means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, municipal securities in contravention of MSRB Rule G-20.

116.   By reason of the foregoing, LeCroy and MacFaddin directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 15B(c)(1) of the Exchange Act, 15 U.S.C. §78o-4(c)(1), and MSRB Rule G-20.

## VI.  RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

## I.  Declaratory Relief

Declare, determine and find the Defendants have committed the violations of the federal securities laws alleged herein.

## II.  Permanent Injunction

Issue a Permanent Injunction, enjoining the Defendants, their officers, agents, servants, employees, attorneys, and representatives, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. §77q(a); Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5; and Section 15B(c)(1) of the Exchange Act, 15 U.S.C. §78o-4(c)(1) and MSRB Rules G-17 and G-20.

## III.  Disgorgement

Issue an Order directing the Defendants to disgorge all profits or proceeds they received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

## IV.  Further Relief

Grant such other and further relief as may be necessary and appropriate.

## V.  Retention Of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

November 3, 2009                    Respectfully submitted,


                                   *Robert K. Levenson*
                                   Robert K. Levenson
                                   Florida Bar No. 0089771
                                   Regional Trial Counsel
                                   U.S. Securities and Exchange Commission
                                   801 Brickell Avenue, Suite 1800
                                   Miami, Florida 33131
                                   (305) 982-6341 (direct dial)
                                   (305) 536-4154 (facsimile)
                                   levensonr@sec.gov
                                   **Lead attorney, trial attorney and attorney**
                                   **to be noticed**
                                   Appearing pursuant to Local Rule 83.1(c)


                                   Jason R. Berkowitz
                                   Pennsylvania Bar No. 87775
                                   Senior Counsel
                                   U.S. Securities and Exchange Commission
                                   801 Brickell Avenue, Suite 1800
                                   Miami, Florida 33131
                                   (305) 982-6309 (direct dial)
                                   berkowitzj@sec.gov
                                   Appearing pursuant to Local Rule 83.1(c)