FILED

2010 Jan-15  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Southern Division

| | | |
|---|---|---|
| **Securities and Exchange Commission,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:09-cv-02238-AKK** |
| | : | |
| **v.** | : | |
| | : | |
| **Charles E. LeCroy and Douglas W. MacFaddin,** | : | |
| | : | |
| **Defendants.** | : | |

---

## DEFENDANT DOUGLAS W. MACFADDIN'S MOTION TO DISMISS

---

### Defendant Respectfully Requests Oral Argument

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

PRELIMINARY STATEMENT ...............................................................1

THE CLAIMS ........................................................................................4

I.    ARGUMENT ...................................................................................6

    A.    The Court Lacks Subject Matter Jurisdiction Over Counts I – III
        With Respect To The Swaps ...................................................6

        1.    Indisputable Facts Show That The SEC Has No Jurisdiction
            To Enforce The Antifraud Statutes With Respect To The
            Swaps At Issue Here ...............................................6

            a.    The Text Of The CFMA Clearly Shows That Congress
                Did Not Intend For The SEC To Have Antifraud
                Jurisdiction Over "Non-Security-Based" Swap
                Agreements ...............................................8

            b.    The CFMA's Definitions Show That Congress
                Appreciated The Distinctions Between Diverse Swap
                Agreements, And It Would Therefore Be Inappropriate
                To Read Any Additional Terms Into These Definitions ..........10

            c.    The Nature Of The SIFMA Index Demonstrates That It Is
                An Index Of Interest Rates, Not An Index Of Securities,
                And Therefore Swaps Based On The SIFMA Index Are
                "Non-Security-Based" Swap Agreements ...............................13

                i.    The SIFMA Index Is An Index Of Interest Rates, Not
                    An Index Of Securities ...............................13

                ii.    None Of The Swaps Is Based On The "Price, Yield,
                   Value, Or Volatility" Of Any Security Or Any Group
                   Or Index Of Securities ...............................18

                iii. The SEC's "Simultaneous With" Argument
                 Completely Lacks Merit ...............................22

        2.    The Court Is Not Precluded From Determining Whether It
            Lacks Subject Matter Jurisdiction Over The Complaint At
            This Stage Of The Proceedings Because There Are No Facts
            In Dispute ...............................................25

a. The Court May Address Mr. MacFaddin's Motion To Dismiss At This Stage Because It Is A "Facial" Attack To Subject Matter Jurisdiction ................................................. 26

b. The Court May Take Judicial Notice Of Facts Where A Defendant Mounts A Facial Attack To Subject Matter Jurisdiction ...................................................................... 27

c. There Can Be No Genuine Dispute About Any Facts Relevant To The Court's Determination Of Subject Matter Jurisdiction ........................................................ 30

B. The Complaint Fails To State A Claim Upon Which Relief Can Be Granted With Respect To Counts I – IV .................................................. 32

1. Elements of Counts I – IV And The Motion to Dismiss Standard ........................................................................... 33

2. Counts I – IV Of The Complaint Must Be Dismissed Because The Complaint Fails To Plead Fraud With Particularity As Required By Rule 9(b) ................................................... 35

3. Counts I – IV Of The Complaint Must Be Dismissed Pursuant To Rule 12(b)(6) Because The Complaint Fails To State A Claim ............................................................................... 41

a. Counts I – III Fail To State A Claim As To The Swaps Because The Swaps Are Not Subject To The Antifraud Statutes .................................................................... 42

b. The Complaint Fails To Allege Sufficient Facts To Establish That Mr. MacFaddin Had Any Duty To Disclose, And Therefore Does Not Allege An Actionable Omission ................................................................. 42

i. The Complaint Fails To Allege That Mr. MacFaddin Had Any Duty To Disclose With Respect To The Swaps ............................................................ 45

ii. The Complaint Fails To Allege That Mr. MacFaddin Had Any Duty To Disclose With Respect To The Warrants ...................................................... 49

(A) The Allegations Of The Complaint Are Insufficient To Establish That Mr. MacFaddin Was Involved In The Offer, Purchase, Or Sale Of

The Warrants, Or The Disclosures That
Accompanied Their Issue..............................................50

(B)  The Complaint Fails To Establish That Mr.
MacFaddin Had Any Duty To Disclose To The
Warrant Purchasers .....................................................52

(C)  Mr. MacFaddin Had No Duty To Disclose To
The County..................................................................54

c.  The Complaint Fails To Allege That Mr. MacFaddin
Made Any Actionable Misstatement Or Omission...................56

d.  The Complaint Does Not Allege Sufficient Facts To
Establish That Mr. MacFaddin Acted Negligently Or
With Scienter..........................................................................58

II.  CONCLUSION ...............................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aaron v. SEC*,
446 U.S. 680 (1980)............................................................34

*Acierno v. Haggerty*,
No. Civ. A. 04-1376-KAJ, 2005 WL 3134060 (D. Del. Nov. 23, 2005)..........28

*American United Life Ins. Co. v. Martinez*,
480 F.3d 1043 (11th Cir. 2007) .........................................34

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)..........................................34, 35, 51

*Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*,
944 F. Supp. 1169 (S.D.N.Y. 1996) .................................46

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................passim

*Bloor v. Carro*,
754 F.2d 57 (2d Cir. 1985) ..............................................58

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*,
116 F.3d 1364 (11th Cir. 1997) ..................................16, 36

*Chiarella v. United States*,
445 U.S. 222 (1980)..........................................42, 43, 45, 55

*Cooper v. Parsky*,
140 F.3d 433 (2d Cir. 1998) ............................................46

*Cordova v. Lehman Bros., Inc.*,
526 F. Supp. 2d 1305 (S.D. Fla. 2006)........................38, 40

*D.E. & J. Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003) ...........................38

*Davila v. Delta Air Lines, Inc.*,
326 F.3d 1183 (11th Cir. 2003) .................................30, 44

*Denius v. Dunlap*,
    330 F.3d 919 (7th Cir. 2003) ..................................................................28

*Doe v. Mann*,
    285 F.Supp.2d 1229 (N.D. Cal. 2003),
    *aff'd* 415 F. 3d 1038 (9th Cir. 2005)......................................................28

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006) .....................................................29

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998)..................................................................................16

*Flying J Fish Farm v. Peoples Bank of Greensboro*,
    12 So. 3d 1185 (Ala. 2008).......................................................................43

*Gewin v. TCF Asset Mgmt. Corp.*,
    668 So. 2d 523 (Ala. 1995).......................................................................43

*In re Bio-Technology Gen. Corp. Sec. Litig.*,
    380 F. Supp. 2d 574 (D.N.J. 2005)......................................................60, 61

*In re Bisys Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) .................................................38, 39

*In re Cascade Int'l Sec. Litig.*,
    840 F. Supp. 1558 (S.D. Fla. 1993).....................................................43, 49

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) ........................................................38

*In re Royal Dutch/Shell Transp. Secs. Litig.*,
    404 F. Supp. 2d 605 (D.N.J. 2005)...........................................................16

*In re Snell and LeCroy*,
    90 SEC Docket 1536, Admin. Proc. File 3-12359,
    2007 WL 1297008 (SEC May 3, 2007)...............................................8, 9, 23

*Keene Corp. v. United States*,
    508 U.S. 200 (1993)..............................................................................16, 17

*Kloder v. Bennett*,
    No. 89-3430, 1990 U.S. App. LEXIS 11591 (6th Cir. July 9, 1990)................48

*Lawrence v. Dunbar*,
  919 F.2d 1525 (11th Cir. 1990) ..........................................................................26

*LeBrun v. Kuswa*,
  24 F. Supp. 2d 641 (E.D. La. 1998)......................................................................6

*MacDonald v. Alan Bush Brokerage Co.*,
  863 F.2d 809 (11th Cir. 1989) ............................................................................58

*McElmurray v. Consol. Gov't of Augusta-Richmond County*,
  501 F.3d 1244 (11th Cir. 2007) ..........................................................................27

*Morrison v. Amway Corp.*,
  323 F.3d 920 (11th Cir. 2003) ......................................................................25, 27

*O'Toole v. Northrop Grumman Corp.*,
  499 F.3d 1218 (10th Cir. 2007) ..........................................................................29

*OJO v. Farmers Group, Inc.*,
  No. CV 05-5818-JFW, 2006 WL 4552707 (C.D. Cal. Mar. 7, 2006),
  *rev'd on other grounds*, 565 F.3d 1175 (9th Cir. 2007) ...............................27, 28

*Papasan v. Allain*,
  478 U.S. 265 (1986)............................................................................30, 35, 44

*Procter & Gamble Co. v. Bankers Trust Co.*,
  925 F. Supp. 1270 (S.D. Ohio 1996) ..................................................................16

*Puterman v. Lehman Bros., Inc.*,
  332 F. App'x 549 (11th Cir. 2009) ......................................................................38

*Sanders v. John Nuveen & Co.*,
  524 F.2d 1064 (7th Cir. 1975), *vacated and remanded on other grounds*,
  425 U.S. 929 (1976)............................................................................................53

*Schlifke v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) ..............................................................................43

*School Dist. of City of Erie v. J.P. Morgan Chase Bank*,
  No. 08 CV 07688LAP, 08 CV 07982, 2009 WL 234128
  (S.D.N.Y. Jan. 30, 2009)...............................................................................passim

*SEC v. Cochran*,
   214 F.3d 1261 (10th Cir. 2000) ........................................................................34

*SEC v. Currency Trading Int'l, Inc.*,
   No. CV 02-05143PA, 2004 WL 2753128 (C.D. Cal. 2004) ..............................62

*SEC v. Dauplaise*,
   No. 6:05CV1391 ORL 31KRS, 2006 WL 449175
   (M.D. Fla. Feb. 22, 2006) ....................................................................36, 56, 57

*SEC v. Dunlap*,
   No. 01-8437-CIV, 2002 WL 1007626 (S.D. Fla. March 27, 2002) ...................36

*SEC v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008) ..........................................................58, 61

*SEC v. Langford, et al.*,
   No. 08-cv-0761 (N.D. Ala. filed Apr. 30, 2008) ...............................2, 7, 17, 25

*SEC v. Lucent Techs., Inc.*,
   363 F. Supp. 2d 708 (D.N.J. 2005) ...............................................................56, 57

*SEC v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) ..........................................................................34

*SEC v. Mut. Benefits Corp.*,
   408 F.3d 737 (11th Cir. 2005) .....................................................................27, 31

*SEC v. Physicians Guardian Unit Inv. Trust, ex rel.*,
   72 F. Supp. 2d 1342 (M.D. Fla. 1999)...............................................................35

*SEC v. Roanoke Tech. Corp.*,
   No. 6:05-cv-1880-Orl-31KRS, 2006 WL 3813755
   (M.D. Fla. Dec. 26, 2006)...........................................................................40, 41

*SEC v. Rubera*,
   350 F.3d 1084 (9th Cir. 2003) ..........................................................................61

*SEC v. Scrushy*,
   No. CV-03-J-615S, 2005 WL 3279894 (N.D. Ala. Nov. 29, 2005) ......16, 36, 41

*SEC v. Solow*,
  No. 06-81041 CIV, 2007 WL 1970806 (S.D. Fla. May 10, 2007),
  *aff'd*, No. 08-13014, 2009 WL 139503 (11th Cir. Jan. 21, 2009)......................34

*SEC v. Treadway*,
  430 F. Supp. 2d 293 (S.D.N.Y. 2006) ................................................................58

*SEC v. Yuen*,
  221 F.R.D. 631 (C.D. Cal. 2004)..................................................................38, 39

*Shields v. Citytrust Bancorp.*,
  25 F.3d 1124 (2d. Cir. 1994) ..............................................................................58

*Shores v. M.E. Ratliff Inv. Co.*,
  No. CA 77-G-0604-S, 1982 WL 1559 (N.D. Ala. 1982) ..............................52, 53

*St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n*,
  No. Civ.A. 04-4540, 2005 WL 1199045 (D.N.J. May 18, 2005)...............passim

*Termarsch v. Argent Mortgage Co., LLC*,
  No. 8:07-CV-1725-T-30TBM, 2008 WL 1776592
  (M.D. Fla. April 16, 2008)..................................................................................29

*U.S. SEC v. Fitzgerald*,
  135 F. Supp. 2d 992 (N.D. Cal. 2001).........................................................34, 36

*United States ex rel. Carroll v. JFK Med. Ctr.*,
  No. 01-8158-CIV, 2002 WL 31941007
  (S.D. Fla. Nov. 15, 2002)....................................................................................52

*United States v. Cochran*,
  109 F.3d 660 (10th Cir. 1997) ......................................................................44, 54

*United States v. Hunt*,
  No. 05-CR-395-DAB, 2006 U.S. Dist. LEXIS 64887 (S.D.N.Y. Sept. 6,
  2006) ...................................................................................................................48

*United States v. Skelly*,
  442 F.3d 94 (2d Cir. 2006) ...........................................................................43, 49

*Williamson v. Tucker*,
  645 F.2d 404 (5th Cir. 1981) ..............................................................................26

*Ziemba v. Cascade Int'l Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ...................................................................passim

**STATUTES**

17 C.F.R. § 240.10b-5.......................................................................................passim

15 U.S.C. § 20(b) ......................................................................................................6

15 U.S.C. § 21(d)(1)..................................................................................................6

15 U.S.C. § 77b-1(b) .................................................................................................8

15 U.S.C. § 77q(a) ................................................................................................6, 9

15 U.S.C. § 77q(a)(1)................................................................................................5

15 U.S.C. § 77q(a)(2)................................................................................................5

15 U.S.C. § 77q(a)(3)................................................................................................5

15 U.S.C. § 77t(b) .....................................................................................................6

15 U.S.C. § 78c-1(b) .................................................................................................8

15 U.S.C. § 78j..........................................................................................................6

15 U.S.C. § 78j(b) ..............................................................................................5, 6, 9

15 U.S.C. § 78o-4(c)(1) ............................................................................................5

15 U.S.C. § 78u(d)(1)................................................................................................6

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
    § 301(a), 114 Stat. 2763, 2763A-449-51 ......................................................passim

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
    § 301, 114 Stat. 2763, 2763A-449-51..........................................................10, 16

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
    § 303(d), 114 Stat. 2763, 2763A-452-54 .............................................................9

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
    § 302(b), 114 Stat. 2763, 2763A-452-54 .............................................................9

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
§ 303(a), 114 Stat. 2763, 2763A-452 ...................................................8

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
§ 302(a), 114 Stat. 2763, 2763A-458-54 ...........................................8

Exchange Act § 10 ..............................................................................6

Exchange Act § 10(b) ...................................................................passim

Exchange Act § 15B(c)(1) .........................................................5, 62

Exchange Act § 3A(b).........................................................................8

FED. R. CIV. P. 9(b) .....................................................................passim

FED. R. CIV. P. 12(b)(1)..............................................................26, 62

FED. R. CIV. P. 12(b)(6)...................................................33, 34, 41, 62

FED. R. EVID. 201(b) ........................................................................28

Municipal Securities Rulemaking Board Rule G-17 ...............5, 34, 36, 62

Municipal Securities Rulemaking Board Rule G-20 ................................5

Gramm-Leach-Bliley Act, Pub. Law 106-102, Title II, §§ 206A-206C ............6, 10

Securities Act § 17(a)..............................................................6, 9, 34

Securities Act § 17(a)(1):..........................................................5, 33, 36, 62

Securities Act § 17(a)(2)............................................................5, 34, 61, 62

Securities Act § 17(a)(3) ............................................................5, 34, 62

Securities Act § 2A(b).........................................................................8

## OTHER AUTHORITIES

5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND
PROCEDURE § 1216 (3d ed. 2004).......................................................35

Barclays Capital, U.S. Corporate Floating Rate Note Index Factsheet, available at https://ecommerce.barcap.com/indices/action/indexDownload?id=249a1e ae09fda77f859a64007d54d8e2&collar=&pageId=9 (last visited Jan. 14, 2010) ..........................................................................................14, 20

BLACK'S LAW DICTIONARY 592 (6th ed. 1990) .......................................31

British Bankers' Assoc., The Basics, bbalibor, available at http://www.bbalibor.com/bba/jsp/polopoly.jsp?d=1627 (last visited Jan. 14, 2010) ...........................................................................................17

FinCad, Support Programs, Financial Derivatives Terms, available at http://www.fincad.com/services/support-programs/financial-derivatives-terms/us-bond-market.aspx (last visited Jan. 14, 2010) .....................................16

Int'l Swaps and Derivatives Assoc., Product Descriptions and Frequently Asked Questions, available at http://www.isda.org/educat/faqs.html#9 (last visited Jan. 14, 2010) .........................................................................7

MSRB, Glossary of Municipal Securities Terms, "Interest Rate," available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=INTEREST RATE ...............................................................................................21

MSRB, Glossary of Municipal Securities Terms, "Interest Rate Swap Contract," available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=INTEREST RATESWAPCONTRACT. ..............................................................18

MSRB, Glossary of Municipal Securities Terms, "LIBOR", available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=LIBOR. ............17

MSRB, Glossary of Municipal Securities Terms, "Yield," available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=YIELD. ............20

SIFMA, Answering Your Questions About The Securities Industry and Financial Markets Association (SIFMA) Municipal Swap Index, available at http://www.sifma.org/capital_markets/swapindex.shtml (last visited Jan. 14, 2010) ...................................................................2, 14

## INTRODUCTION

Defendant Douglas W. MacFaddin brings this Motion to Dismiss Counts I – IV of the complaint filed by the SEC.  A short synopsis of the relief sought is as follows:

The allegations in Counts I – III should be dismissed with respect to the swap transactions, as the Court lacks subject matter jurisdiction over the SEC's claims.  In addition, because none of the swaps is a security or a security-based swap agreement, these Counts should be dismissed for failure to state a claim.

Counts I – IV should be dismissed as to both the swap transactions and the warrant transactions for failure to state a claim and failure to allege fraud with particularity.

## PRELIMINARY STATEMENT

With its complaint, the Securities and Exchange Commission (the "SEC") once again attempts to expand its jurisdiction over swap transactions, in spite of explicit statutory language and prior case law that make clear that the SEC does not have jurisdiction over these financial products.

The antifraud statutes which form the basis of the SEC's claims apply only to securities and security-based swap agreements.  As will be shown in detail below, the swaps at issue here are neither securities nor security-based swap agreements.  Rather, they are based in part on a benchmark interest rate index

1

published by the Securities Industry and Financial Markets Association ("SIFMA"), an industry trade group. This so-called "SIFMA Index"[1] is clearly not an index of securities, it is an index of interest rates.

Mr. MacFaddin is unaware of any decision in which a court has upheld the SEC's position that it has jurisdiction over swaps based on the SIFMA Index. The SEC has made similar allegations in the case of *SEC v. Langford, et al.*, No. 08-cv-0761 (N.D. Ala. filed Apr. 30, 2008), now pending in this District. The SEC's jurisdictional theory is being challenged not only by the defendants in that case, but also by SIFMA.

The SEC recognizes the problem it faces in trying to argue that these swaps are "security-based." The SEC seeks to avoid the problem by ignoring the reality of the transactions and spinning a complaint that attempts to combine the swaps with separate warrant transactions, which arguably do fall under the SEC's antifraud jurisdiction. The SEC characterizes this theory as "an additional basis"

---

[1] The SEC's complaint refers to this index as the "BMA Municipal Swap Index." (*See, e.g.*, Complaint ¶ 18.) The SIFMA Municipal Swap Index (the "SIFMA Index") was formerly known as The Bond Market Association/PSA Municipal Swap Index. *See* SIFMA, Answering Your Questions About The Securities Industry and Financial Markets Association (SIFMA) Municipal Swap Index, available at http://www.sifma.org/capital_markets/swapindex.shtml (last visited Jan. 14, 2010). Attached hereto as Exhibit 1. Mr. MacFaddin refers herein to the SIFMA Index.

As discussed more fully in Section I.A.2.b. below, the Court may consider the documents attached hereto because the documents are referenced in, and central to, the allegations in the SEC's complaint, and/or because the documents are the proper subjects of judicial notice. *See also infra* fn. 23. In order to assure the Court and the parties to this action of the accuracy of the sources cited by Mr. MacFaddin, true copies of these sources are attached hereto.

for jurisdiction.  As will be shown below, the SEC has tried this before without success.  In fact, there is case law and a ruling from an SEC Administrative Law Judge, which was subsequently confirmed by the SEC, that just because parties contemplate a simultaneous swap and bond transaction, the two transactions do not constitute a single transaction with a bond component.  They remain separate transactions.

Another fatal flaw in the SEC's complaint is that it fails to allege fraud by Mr. MacFaddin with the requisite particularity.  Here, Mr. MacFaddin's relationship with, and obligations to, Jefferson County were governed by written agreements between Jefferson County and Mr. MacFaddin's employer, JPMorgan.[2]  Those agreements make clear that there is no fiduciary obligation between the parties, and they explicitly state that Jefferson County relied on its own advisors and did not rely on JPMorgan in deciding whether to enter into the transactions at issue.  Accordingly, Mr. MacFaddin had no duty to disclose the payments alleged in the Complaint, and there is no allegation that he had such a duty.  In addition, the aforementioned agreements spell out the specific notice obligations of the parties, and there is no allegation that Mr. MacFaddin failed to comply with these obligations.

---

[2] For purposes of this motion to dismiss, "JPMorgan" refers to both JPMorgan Chase Bank, N.A. ("JPMorgan Chase") and JPMorgan Securities Inc. ("JPMorgan Securities"), as used in the SEC's complaint.  (*See* Compl. ¶¶ 10-11.)

## THE CLAIMS

The SEC's complaint (the "Complaint") alleges wrongdoing by Mr. MacFaddin and Charles LeCroy in connection with a series of financing transactions executed by JPMorgan and Jefferson County, Alabama (the "County") between October 2002 and November 2003.  At the time of these transactions, Mr. MacFaddin served as managing director of JPMorgan Securities' Municipal Derivatives Department, where he was responsible for JPMorgan Securities' municipal derivatives operations (*see* Compl. ¶ 9,) and Mr. LeCroy was managing director of JPMorgan Securities' Southeast Regional office, where he was responsible for municipal securities business (*see id*. ¶ 8.)  The heart of the SEC's claims are alleged omissions by Messrs. LeCroy and MacFaddin relating to JPMorgan's payments to certain of the advisors hired by the County.  (*See, e.g*., *id*. ¶ 5.)

The SEC alleges that Mr. MacFaddin has violated the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), and rules of the Municipal Securities Rulemaking Board ("MSRB") with respect to the County's issuance of three series of sewer revenue warrants (collectively, the "Warrants") and three interest rate swap transactions (collectively, the "Swaps").  (*See id*. ¶¶ 13-14.)  The Complaint alleges that these six separate transactions (collectively, the "Relevant Transactions") are as follows:

- an $839 million sewer revenue warrant offering that closed October 24, 2002 (the "2002-C Warrants") (*see id.* ¶ 13);

- a $1.1 billion sewer revenue warrant offering that closed May 1, 2003 (the "2003-B Warrants") (*see id.*);

- a $1.05 billion sewer revenue warrant offering that closed August 7, 2003 (the "2003-C Warrants") (*see id.*);

- a $1.1 billion swap agreement with JPMorgan executed on March 28, 2003 (the "March 2003 Swap") (*see id.* ¶¶ 14, 50);

- a $789 million swap agreement with JPMorgan executed on July 14, 2003 (the "July 2003 Swap") (*see id.* ¶¶ 14, 73); and

- a $111 million swap agreement with JPMorgan executed on November 7, 2003 (the "November 2003 Swap") (*see id* ¶ 14).

Based on the Relevant Transactions, the SEC brings the following five claims against Mr. MacFaddin:

- Count I: violation of Securities Act § 17(a)(1), 15 U.S.C. § 77q(a)(1) (*see id.* ¶¶ 94-96);

- Count II: violation of Securities Act §§ 17(a)(2) and 17(a)(3), 15 U.S.C. §§ 77q(a)(2), (3) (*see id.* ¶¶ 97-99);

- Count III: violation of Exchange Act § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (*see id.* ¶¶ 100-102);

- Count IV: violation of Exchange Act § 15B(c)(1), 15 U.S.C. § 78o-4(c)(1), and MSRB Rule G-17 (*see id.* ¶¶ 103-109); and

- Count V: violation of Exchange Act § 15B(c)(1), 15 U.S.C. § 78o-4(c)(1), and MSRB Rule G-20 (*see id.* ¶¶ 110-116).

# I.    ARGUMENT

## A.    The Court Lacks Subject Matter Jurisdiction Over Counts I – III With Respect To The Swaps

The SEC may maintain civil injunctive actions for violations of Exchange Act § 10(b), Rule 10b-5, and Securities Act § 17(a) (collectively, the "Antifraud Statutes"), only where the transactions at issue involve a "security" or a "security-based swap agreement."[3]  The SEC has very limited jurisdiction over any type of swap.  It has no regulatory jurisdiction at all.  It does not have jurisdiction over the type of swaps involved in the Relevant Transactions, which are based on indices of interest rates, namely, the SIFMA Index and/or the London InterBank Offered Rate ("LIBOR").  Obviously, there can be no violation of the Antifraud Statutes – and thus no federal subject matter jurisdiction – where the transactions at issue do not involve a security or a security-based swap agreement.  *See*, *e.g.*, *LeBrun v. Kuswa*, 24 F. Supp. 2d 641, 649 (E.D. La. 1998).

### 1.    Indisputable Facts Show That The SEC Has No Jurisdiction To Enforce The Antifraud Statutes With Respect To The Swaps At Issue Here

A swap is a privately negotiated contract between two parties (known as "counterparties") to exchange cash flows at specified intervals during the

---

[3]  *See* Securities Act § 17(a), 15 U.S.C. § 77q(a), § 20(b), 15 U.S.C. § 77t(b); Exchange Act § 10(b), 15 U.S.C. § 78j(b), § 21(d)(1), 15 U.S.C. § 78u(d)(1); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  Although Exchange Act § 10 refers to both a "security-based" and "securities-based" swap agreement, these types of swaps are the same.  This is clear from Section 10's use of the same statutory provision (*i.e.*, § 206B of the Gramm-Leach-Bliley Act) to define each term.  *See* Exchange Act § 10, 15 U.S.C. § 78j.

agreed-upon life of the contract.  An interest rate swap is a privately negotiated contract to exchange interest rate cash flows, calculated by multiplying each counterparty's applicable interest rate by a notional principal amount (which itself is not actually exchanged), at specified intervals during the life of the agreement. It is common for swaps to have one counterparty's floating interest rate level pegged to a benchmark interest rate, such as those established by LIBOR and the SIFMA Index.  *See St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n*, No. Civ.A. 04-4540, 2005 WL 1199045, *1 (D.N.J. May 18, 2005) (describing terms and mechanics of typical interest rate swap agreement).[4]

Each of the Swaps used the SIFMA Index, at least in part, as the benchmark interest rate to establish one of the counterparty's cash flow payment obligations.  (*See* Compl. ¶¶ 18-19.)  The SEC alleges that because the Swaps were based on the SIFMA Index, the Court has subject matter jurisdiction over the SEC's claims with respect to the Swaps.  (*See id.* ¶¶ 17-19.)  However, these allegations of subject matter jurisdiction are examples of the SEC's recent effort to impermissibly expand its jurisdiction over "non-security-based" swap agreements. As in *SEC v. Langford, et al.*, the SEC's jurisdictional theory in the instant action is novel, goes well-beyond the limits of the SEC's authority over swaps as

---

[4] *See also* Int'l Swaps and Derivatives Assoc., Product Descriptions and Frequently Asked Questions, #10. Product description: Interest rate swaps, at 2, available at http://www.isda.org/educat/faqs.html#9 (last visited Jan. 14, 2010).  Attached hereto as <u>Exhibit 2</u>.

established by Congress, and finds no support in any binding or persuasive legal authority.

In order to understand why the SEC's asserted antifraud jurisdiction over SIFMA-based swaps does not exist, it is necessary to understand the nature and composition of the SIFMA Index, and the legislative history and text of the Commodity Futures Modernization Act of 2000 (the "CFMA"), which clarified the SEC's limited authority over swaps.

       **a.**    **The Text Of The CFMA Clearly Shows That Congress Did Not Intend For The SEC To Have Antifraud Jurisdiction Over "Non-Security-Based" Swap Agreements**

The SEC's jurisdiction over swaps is much narrower than the jurisdiction it enjoys over securities. The CFMA contained a number of amendments to the securities laws that sharply, and clearly, limited the SEC's authority over swaps. The CFMA amended the securities laws to make clear that, unlike securities, the SEC has no regulatory jurisdiction over any type of swap.[5] Thus, the SEC cannot require the registration of swaps, impose reporting or record-keeping requirements, or require other procedures or standards as preventative measures against fraud, manipulation, or insider trading.[6] *Accord In re Snell and*

---

[5] *See* CFMA, Pub. Law No. 106-554 § 302(a), 114 Stat. 2763, 2763A-451; Pub. Law No. 106-554 § 303(a), 114 Stat. 2763, 2763A-452.

[6] *See* Securities Act § 2A(b), 15 U.S.C. § 77b-1(b); Exchange Act § 3A(b), 15 U.S.C. § 78c-1(b).

*LeCroy*, 90 SEC Docket 1536, Admin. Proc. File 3-12359, 2007 WL 1297008, *32 (SEC May 3, 2007).

       The CFMA amended (in addition to other securities laws provisions not at issue here) Exchange Act § 10(b) and Securities Act § 17(a) to apply those antifraud provisions only to "security-based" swap agreements.[7]  The SEC lacks <u>any</u> jurisdiction over "non-security-based" swap agreements, even where it alleges fraud in connection with such transactions.  *See Snell and LeCroy*, 2007 WL 1297008 at *32 ("Non-securities-based swaps transactions are not 'securities' for purposes of the federal securities laws."); *St. Matthew's*, 2005 WL 1199045 at *12 ("[A] non-security based swap agreement is not actionable under § 10(b) or Rule 10b-5 because it is neither a 'security,' nor a 'securities-based swap agreement.'"); *School Dist. of City of Erie v. J.P. Morgan Chase Bank*, No. 08 CV 07688LAP, 08 CV 07982, 2009 WL 234128, *1 (S.D.N.Y. Jan. 30, 2009) (same).

       Accordingly, the SEC may pursue Counts I – III against Mr. MacFaddin with respect to the Swaps only if the Swaps are "security-based" swap agreements. However, as demonstrated in Section I.A.1.c. below, the Swaps do not fall within this definition.[8]  Therefore, the SEC may not maintain its claims under

---

[7] *See* Securities Act § 17(a), 15 U.S.C. § 77q(a); Exchange Act § 10(b), 15 U.S.C. § 78j(b); CFMA, Pub. Law No. 106-554 §§ 302(b), 303(d), 114 Stat. 2763, 2763A-452-54.

[8] Although the SEC also alleges an "additional basis for the Court's jurisdiction" over the March 2003 Swap and the July 2003 Swap based on their temporal proximity with the negotiation and

the Antifraud Statutes with respect to the Swaps and Counts I through III should be dismissed for lack of subject matter jurisdiction.

> **b.    The CFMA's Definitions Show That Congress Appreciated The Distinctions Between Diverse Swap Agreements, And It Would Therefore Be Inappropriate To Read Any Additional Terms Into These Definitions**

Congress clearly recognized that there are a host of diverse types of swap agreements.  Indeed, the CFMA includes a very specific definition of "swap agreement" that distinguishes between different types of swaps.[9]  It provides that payments made pursuant to the swap agreement can be "based on the <u>value or level</u> of one or more <u>interest or other rates, currencies, commodities, securities, instruments of indebtedness</u> . . . or other financial or economic interests."[10]

---

execution of warrants, (*see* Compl. ¶ 21,) for the reasons discussed in Section I.A.1.c.iii. below, this argument is also without merit.

[9] Technically, with respect to the definitions of "swap agreement," "security-based swap agreement" and "non-security-based swap agreement," the CFMA amended Sections 206A – 206C of Title II of the Gramm-Leach-Bliley Act, Public Law 106-102.  *See* CFMA, Pub. Law No. 106-554 § 301, 114 Stat. 2763, 2763A-449-51.  For the sake of brevity, only the CFMA amendments are cited herein.

[10] CFMA, Pub. Law No. 106-554 § 301(a), 114 Stat. 2763, 2763A-449-51 (emphasis added). The relevant portions of the definition are as follows:

> [A]ny agreement . . . between eligible contract participants . . . the material terms of which (other than price and quantity) are subject to individual negotiation, and that . . . provides on an executory basis for the exchange, on a fixed or contingent basis, . . . and that transfers, as between the parties to the transaction . . . the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset . . . or liability that incorporates the financial risk so transferred, including any such agreement . . . commonly known as an interest rate swap . . . .

This definition shows that Congress carefully considered the wide range of financial instruments that could be defined as swap agreements, and more importantly, distinguished these swaps from one another by looking to the basis for the counterparties' exchange of payments.   Clearly, the CFMA's drafters understood the distinction between "value" and "level" and between "interest or other rates," "securities" and "instruments of indebtedness."[11]

Based on a clear understanding of the different terms on which swaps may be based, Congress carefully defined the terms "security-based swap agreement" and "non-security-based swap agreement," which resulted in only a limited category of swaps being subject to the Antifraud Statutes.  The CFMA defined a "security-based swap agreement" to mean "a swap agreement . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein."[12]  Therefore, the CFMA requires that a "security-based swap agreement" have the following two characteristics: (i) a material term based on the "price, yield, value, or volatility" (ii) of a security, group of securities or index of securities.[13]   The CFMA's definition of "non-security-based swap agreement" is as broad as possible, simply

---

[11] *Id.*
[12] CFMA, Pub. Law No. 106-554 § 301(a), 114 Stat. 2763, 2763A-451.
[13] *Id.*

meaning the negative of a "security-based swap agreement," *i.e.*, "any swap agreement . . . that is not a security-based swap agreement . . . "[14]

By reading the definition of "swap agreement" and "non-security-based swap agreement" together, there can be no doubt that Congress intended for a large proportion of swap agreements, including any based on "interest or other rates," to constitute "non-security-based" swap agreements. The statutory language on its face is unambiguous: there are those swaps based on "interest or other rates," and there are those swaps based on "securities" or "instruments of indebtedness." Only the latter can reasonably be interpreted to come within the definition of a "security-based swap agreement." It is unnecessary and inappropriate to read additional terms into the statutory language. However, this is precisely what the SEC has asked the Court to do in alleging subject matter jurisdiction in the Complaint. (*See* Compl. ¶¶ 17-19.) As demonstrated below, the SEC's conclusion that the SIFMA Index is an "index of securities," (*id*. ¶ 8,) is contradicted by facts that the SEC cannot contest, and of which the Court may take judicial notice.

---

[14] *Id.*

     **c.**     **The Nature Of The SIFMA Index Demonstrates That It Is An Index Of Interest Rates, Not An Index Of Securities, And Therefore Swaps Based On The SIFMA Index Are "Non-Security-Based" Swap Agreements**

Mr. MacFaddin does not dispute the SEC's allegations that the Swaps were entered into between the County and JPMorgan, and each had a material term (*i.e.*, "interest rate payments") based in whole or in part on the SIFMA Index.  (*See* Compl. ¶¶ 18-19, 50, 73, 89.)  However, the SEC's conclusion that the Swaps are subject to the Antifraud Statutes is wrong for three reasons: (i) the SIFMA Index is not an "index of securities," but rather, like LIBOR, is an interest rate index; (ii) none of the Swaps was based on the "price, yield, value, or volatility of any security or any group or index of securities,"[15] and (iii) the fact that certain of the Swaps might have been executed at around the same time as certain of the Warrants does not provide the SEC with jurisdiction over the "non-security-based" swaps at issue in the Complaint.  Indisputable facts about the SIFMA Index discussed below clearly demonstrate that these conclusions are correct as a matter of law.

     **i.**     **The SIFMA Index Is An Index Of Interest Rates, Not An Index Of Securities**

Tellingly, the Complaint itself acknowledges that each of the Swaps was an interest rate swap.  (*See* Compl. ¶¶ 18-19.)  The Swaps were interest rate

---

[15] CFMA, Pub. Law No. 106-554 § 301(a), 114 Stat. 2763, 2763A-451.

swaps (as contrasted with commodities swaps or securities swaps, *e.g.*) precisely because they were based on the SIFMA Index.

SIFMA publishes the SIFMA Index by using market data provided by a third party.[16]  The third party selects a set of tax-exempt variable rate demand notes ("VRDNs") that satisfy specific criteria established by SIFMA.[17]  While SIFMA selects the criteria to be used by the third party, SIFMA does not know the identity of the VRDNs from which interest rates are extracted to calculate the SIFMA Index.[18]  The SIFMA Index is produced on a weekly basis by calculating the "standard deviation of the rates" extracted from the chosen set of VRDNs.[19]  As distinguished from an actual index of securities, the SIFMA Index is compiled only using the interest rates of the selected VRDNs.  Any other characteristic of the VRDNs that would have significance to a person interested in the value of an index of securities – including identifying information, prices, volatilities, maturities, or prepayment terms – are neither included as part of, nor represented by, the SIFMA Index.[20]

---

[16] *See* Ex. 1, SIFMA, Answering Your Questions About The Securities Industry and Financial Markets Association (SIFMA) Municipal Swap Index, at 1-2.

[17] *Id.*

[18] *See id.*

[19] *Id.*

[20] *Id.*  An example of an actual index of securities is the Barclays Capital U.S. Corporate Floating Rate Note Index, which is based on information obtained from up to 50 underlying bonds, including price, interest rate, maturity, issue date, and principal amount.  These factors are then used to measure the "performance" or "return" of the portfolio of bonds represented by the index.  Barclays Capital, U.S. Corporate FRN Index Factsheet, available at

Thus, the SIFMA Index represents a benchmark interest rate, not the value of any security or group or index of securities.  For this reason, it can serve as the basis for the exchange of "interest rate payments," (Compl. ¶ 18,) in an interest rate swap.  For the same reason, the SIFMA Index cannot be squeezed into the categories of a security, a group of securities, or an index of securities, as would be necessary in order for the SEC to have jurisdiction over swaps with a material term based on the SIFMA Index.

The SEC is apparently of the belief that the CFMA's definitions of "swap agreement" and "security-based swap agreement" are ambiguous, and therefore, the Court is permitted to equate the term "index of interest rates" to "index of securities."  However, in order to accept the SEC's conclusion that the SIFMA Index is an "index of securities," the Court would be forced to re-write the CFMA's carefully drafted definition of a "security-based swap agreement" to include an index of interest rates extracted from a group of securities.  This would be inappropriate due to Congress' careful drafting and use of unambiguous terms, and it also would ignore the CFMA's distinctions between swaps based on "interest or other rates" and those based on "securities" or "instruments of

---

https://ecommerce.barcap.com/indices/action/indexDownload?id=249a1eae09fda77f859a64007d54d8e2&collar=&pageId=9 (last visited Jan. 14, 2010).  Attached hereto as <u>Exhibit 3</u>.

indebtedness."[21]  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted).

That the SIFMA Index is an interest rate index is made all the more clear when it is compared to another interest rate index commonly used as a basis for calculating payments in interest rate swaps: LIBOR.  Indeed, the market employs the SIFMA Index as the tax-exempt equivalent of LIBOR.[22]  Although not mentioned in the Complaint, the March 2003 Swap and July 2003 Swap were based on both the SIFMA Index and on LIBOR.[23]  These two interest rate swaps

---

[21] CFMA, Pub. Law No. 106-554 § 301, 114 Stat. 2763, 2763A-449-51.  Furthermore, Congress did not draft the CFMA on a blank slate.  Pre-CFMA case law held that the securities laws did not apply to interest rate swaps.  *See, e.g., Procter & Gamble Co. v. Bankers Trust Co*., 925 F. Supp. 1270, 1277-83 (S.D. Ohio 1996).  The Court should presume that Congress was aware of this precedent when it drafted the CFMA definitions at issue here.  *See In re Royal Dutch/Shell Transp. Secs. Litig*., 404 F. Supp. 2d 605, 608 (D.N.J. 2005) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998)).  Had Congress desired to include interest rate swaps in the definition of "security-based swap agreement" it could have easily done so.

[22] *See* FinCad, Support Programs, Financial Derivatives Terms, "US Bond Market Association Municipal Swap Index (BMA Index)" at 1, available at http://www.fincad.com/services/support-programs/financial-derivatives-terms/us-bond-market.aspx (last visited Jan. 14, 2010).  Attached hereto as Exhibit 4.

[23] *See* Confirmation of the March 2003 Swap (March 28, 2003), at 3-4, attached hereto as Exhibit 5; Confirmation of the July 2003 Swap (July 14, 2003), at 3-4, attached hereto as Exhibit 6.  On a motion to dismiss, the Court may consider documents referenced in, and central to, the allegations of the complaint.  *See, e.g*., *Brooks v. Blue Cross and Blue Shield of Florida, Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997); *SEC v. Scrushy*, No. CV-03-J-615S, 2005 WL 3279894, *1 (N.D. Ala. Nov. 29, 2005).  The SEC specifically refers to these two confirmations (together, the "Confirmations") in the Complaint, and the Confirmations are central to the SEC's fraud allegations.  (*See, e.g*., Compl. ¶¶ 57, 78.)  Likewise, the Court may consider the ISDA Master Agreement between The Chase Manhattan Bank (a predecessor to JPMorgan Chase Bank) and

used the SIFMA Index to establish the applicable floating interest rates for a short period at the beginning of their swap terms, then switched over to LIBOR for the remainder of their swap terms.  *See id*.  Like the SIFMA Index, LIBOR is a benchmark interest rate, not a security or group or index of securities.[24]  LIBOR "is a benchmark; giving an indication of the average rate a leading bank, for a given currency, can obtain unsecured funding for a given period in a given currency."[25]  Because LIBOR-based swaps are clearly based on an interest rate, it is well-established that they are non-security-based swap agreements not subject to the Antifraud Statutes.  *See Erie*, 2009 WL 234128 at *1 (holding that a LIBOR-based interest rate swap is not a security-based swap agreement subject to Exchange Act

---

the County, the U.S. Municipal Counterparty Schedule to the Master Agreement, and the Credit Support Annex to the Schedule to the Master Agreement (collectively, the "ISDA") (Jan. 1, 2001), attached hereto as Exhibit 7.  All transactions under the ISDA Master Agreement constitute a single agreement between the counterparties instead of being separate contracts.  The confirmation of a transaction serves as evidence of that transaction, and each transaction is incorporated into the ISDA Master Agreement and each confirmation references the ISDA.  *See* Exs. 5 and 6; Confirmations, at 1.  Therefore, the ISDA is referred to by, and central to the allegations in, the Complaint to same extent as the Confirmations.

The parties have not yet engaged in discovery in this case.  The copies of the underlying transactional documents attached hereto were attached to a motion dismiss filed in *SEC v. Langford, et al*.  A copy of the confirmation of the November 2003 Swap was not attached to that motion.

[24] *See* MSRB, Glossary of Municipal Securities Terms, "LIBOR" (2d ed. 2004), available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=LIBOR.  Copies of each of the MSRB definitions cited herein are attached hereto as Exhibit 8.

[25] British Bankers' Assoc., The Basics, bbalibor, available at http://www.bbalibor.com/bba/jsp/polopoly.jsp?d=1627 (last visited Jan. 14, 2010).  Attached hereto as Exhibit 9.

§ 10(b) and Rule 10b-5); *St. Matthew's*, 2005 WL 1199045 at *12-13 (holding that a LIBOR-based interest rate swap is not a security-based swap agreement).

  The SEC's conclusion that the SIFMA Index is an index of securities ignores the economic reality that the SIFMA Index is functionally equivalent to LIBOR when used as a benchmark for interest rate swaps because the market employs both LIBOR and the SIFMA Index to approximate market interest rates and to hedge against interest rate risk.[26]  It would be anomalous to conclude that although the SIFMA Index and LIBOR were both indices composed solely of interest rates, that the SIFMA Index could be considered an "index of securities," while LIBOR could not.

  The SIFMA Index, like LIBOR, is an index composed entirely of interest rates.  An interest rate is not a security, and an index composed of interest rates is not an "index of securities."  The SIFMA Index is no more an index of securities than LIBOR is an index of loans.

    **ii.** **None Of The Swaps Is Based On The "Price, Yield, Value, Or Volatility" Of Any Security Or Any Group Or Index Of Securities**

  As discussed, because the Swaps were based on the SIFMA Index, they do not qualify as swaps with a material term based on a security, a group of

---

[26] *See, e.g*., Ex. 8, MSRB, Glossary of Municipal Securities Terms, "Interest Rate Swap Contract," available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=INTERESTRATESWAPCONTRACT.

securities, or an index of securities.  The Swaps do not come within the definition of a "security-based swap agreement" for an additional reason:  the SIFMA Index is not based on "price, yield, value, or volatility" of a security, a group of securities, or an index of securities.

The Complaint attempts to gloss over this issue by using conclusory language in referring to the "value" of the SIFMA Index.  (*See* Compl. ¶ 18-19). This conclusion is not supported by indisputable facts.  As shown above, the SIFMA Index is an index of interest rates.  It is inaccurate to characterize the benchmark interest rate that the SIFMA Index represents with the "value" of the VRDNs from which the interest rates are extracted to create the SIFMA Index. Yet that is what the SEC is attempting to do.  Congress clearly recognized this difference, as can be seen by comparing the definition of "swap agreement," ("an agreement . . . based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness") with "security-based swap agreement" ("a swap agreement . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities").[27]

The difference is best illustrated by comparing the SIFMA Index – which represents only a market "level" interest rate – to an index of securities, such

---

[27] CFMA, Pub. Law No. 106-554 § 301(a), 114 Stat. 2763, 2763A-449-51.

as the Barclays Capital U.S. Corporate Floating Rate Note Index, which does have a "value" because it measures the performance of the floating-rate notes comprising the index.[28]   The SIFMA Index provides no such measure of performance for the VRDNs from which interest rates are extracted to calculate the index.  One cannot use the SIFMA Index alone to determine the price, yield, value, or volatility of any particular VRDN or group of VRDNs.  Similarly, one cannot look at the LIBOR rate and determine the obligations of the underlying loan agreements between the banks.  One can only know the interest rate.

In describing the Swaps, the Complaint repeatedly attempts to use terms found in the CFMA definition as if these descriptions can be divorced from the actual meaning of the terms, the context in which the terms appear, and the economic reality of interest rate swaps in general.  For example, the Complaint uses the term "floating rate yield" in describing the market interest rate represented by the SIFMA Index.  (Compl. ¶ 18.)  However, both "interest rate" and "yield" are precisely defined terms, and are not equivalent in either definition or function.  "Yield" means the "annual rate of return on an investment, based on the purchase price of the investment, its coupon rate and the length of time the investment is held."[29]   In contrast, "interest rate" means "the annual rate, expressed as a

---

[28] *See* Ex. 3, Barclays Capital, U.S. Corporate FRN Index, at 1.

[29] Ex. 8, MSRB, Glossary of Municipal Securities Terms, "Yield," available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=YIELD.

percentage of principal, payable for use of borrowed money."[30]   In stating that the SIFMA Index is used to establish "the floating rate yield," (Compl. ¶ 18,) the SEC combines these distinct terms and misconstrues economic reality.

Thus, "interest rate" and "yield" are two separate economic attributes of a bond. Interest rate is an express term of a bond (like principal amount and maturity date), while yield is not.   Yield is a mathematical calculation using components that reflect market conditions and other factors (including the interest rate).  Indeed, unlike the interest rate, the attributes of a security used in the CFMA (*i.e.*, price, yield, value and volatility) each are methods of tracking changes in the market value of the security.

While the SEC may be unwilling to accurately define these concepts, Congress had no such problem.  Congress did not include the term "interest rate" in the CFMA's definition of a security-based swap agreement, limiting the SEC's antifraud jurisdiction to swaps based on the price, yield, value, or volatility of any security, group or index of securities.  There is no way to equate "interest rate" and "yield" without considering additional terms (*e.g.*, the length of time the investment is held), which are not included in the definition of "security-based swap agreement."

---

[30] Ex. 8, MSRB, Glossary of Municipal Securities Terms, "Interest Rate," available at http://www.msrb.org/MSRB1/glossary/view_def.asp?param=INTERESTRATE.

The SIFMA Index is an index of interest rates, a specific component extracted from a group of securities. However, the interest rate on a debt instrument is clearly not the "price, yield, value, or volatility" of that debt instrument. Therefore, an interest rate swap based on the SIFMA Index cannot be said to have a material term based on the price, yield, value, or volatility of a security or group or index of securities. The SEC's conclusion that the Swaps were based on the "value" of the SIFMA Index, (Compl. ¶¶ 18-19,) and that the SIFMA Index establishes the "floating rate yield," (*id.* ¶ 18,) represents either the SEC's fundamental misunderstanding of the SIFMA Index and financial instruments at issue or a bold attempt to obtain the antifraud jurisdiction over non-security-based swaps that Congress chose to exclude from the SEC's ambit. In either case, the SEC has failed to meet its burden of establishing that the Court has subject matter jurisdiction over the Swaps.

### iii.   The SEC's "Simultaneous With" Argument Completely Lacks Merit

The SEC obviously recognized the jurisdictional problems it faces in arguing that these Swaps fall within its antifraud jurisdiction. Accordingly, as a shot in the dark, the SEC claims that "an additional basis for the Court's jurisdiction" over the March 2003 Swap and the July 2003 Swap "is that the County negotiated, executed, and entered into these two swap agreements simultaneously with and as part of the 2003-B and 2003-C bond offerings."

(Compl. ¶ 21.)  For the SEC to make this claim in the face of the rejection of this same theory by at least one court and one SEC Administrative Law Judge ("ALJ") serves only to illustrate the lack of confidence that the SEC has in its claim of jurisdiction over the Swaps.  There are at least three reasons why the Court should reject this allegation.

First, in 2007, an ALJ rejected this very theory in his decision in an SEC administrative proceeding, which decision later became final and constituted the "action of the Commission."  *See Snell and LeCroy*, 2007 WL 1297008 at *33 ("[W]hile an issuer might enter into a swap transaction or a swaption at the same time as it enters a bond offering, the contemporaneous nature of the two transactions does not make them a single financial instrument with a bond component.").  The SEC's prior rejection of this "simultaneous with" argument was found controlling in *Erie*, where Judge Preska rejected the same argument made by a plaintiff alleging a violation of Exchange Act § 10(b) and Rule 10b-5 in connection with bond and LIBOR-based swap transactions.  *See Erie*, 2009 WL 234128 at *1.  Judge Preska stated:

> I adopt the clear implication-and, of course, what I see as the common sense result reached in In re: Snell and Andy LeCroy, 90 SEC Docket 1536, Administrative Proceeding, No.3-12359, 2007 WL 1297008@*32-33 (SEC May 3, 2007).
>
> There, the holding was that even if the parties entered into an interest rate swap agreement at the same time as the underlying bond

transaction, the two transactions are not a single transaction with a bond component.  That was the holding there.

Second, at base, this "simultaneous" argument has no logical substance, and the Complaint makes clear that SEC does not believe it.  The SEC alleges that Mr. MacFaddin engaged in wrongdoing in connection with the 2002-C Warrants, yet fails to allege a cause of action under the Antifraud Statutes based on the interest rate swap that was allegedly negotiated and executed simultaneously with the 2002-C Warrants (the "October 2002 Swap").  (*See* Compl. ¶ 35.)  If the SEC's "simultaneous" argument were supported by law, then the SEC would have jurisdiction over any type of swap that is "negotiated, executed, and entered into" at the same time as a bond transaction.  (*Id.* ¶ 21.)  That would include the October 2002 Swap, even though the floating rate term was based entirely on LIBOR.  *See* Jefferson County, Official Statement of the Sewer Revenue Refunding Warrants, Series 2002-C, at 46 (Oct. 24, 2002).[31]  The only way to explain the SEC's failure to claim jurisdiction is to assume that the SEC implicitly acknowledges that because it clearly has no antifraud jurisdiction over LIBOR-based swaps – *see St. Matthew's*, 2005 WL 1199045 at *12*; *Erie*, 2009 WL 234128 at *1 – it cannot

---

[31] Available at http://jeffco.jccal.org/portal/page?_pageid=254,48977,254_49039&_dad=portal& _schema=PORTAL (last visited Jan. 14, 2010).  Due to the size of this document, only relevant portions are attached hereto as Exhibit 10.  If the Court so desires, Mr. MacFaddin will provide the Court with a complete copy of the Series 2002-C Official Statement.

claim jurisdiction over these non-security-based swaps by virtue of its jurisdiction over a warrant.[32]

Finally, the CFMA does not include the simultaneous execution of swaps and securities transactions as a basis for application of the Antifraud Statutes. The CFMA speaks only in terms of security-based and non-security-based swaps. Congress' decision to not include this as a basis for application of the Antifraud Statutes demonstrates the impropriety of reading that basis into the statute now.

**2.      The Court Is Not Precluded From Determining Whether It Lacks Subject Matter Jurisdiction Over The Complaint At This Stage Of The Proceedings Because There Are No Facts In Dispute**

In the *Langford* case filed in this District in 2008 and referred to above, the SEC was also faced with an attack on its subject matter jurisdiction with respect to interest rate swaps. The SEC's response was to argue that where a challenge to subject matter jurisdiction involves the merits of the complaint, the Court should not consider the subject matter jurisdiction challenge at the motion to dismiss stage, but should await summary judgment to consider its subject matter jurisdiction. *See, e.g.*, *Morrison v. Amway Corp.*, 323 F.3d 920, 924-25 (11th Cir.

---

[32] The Court also should reject the SEC's position based on the detrimental policy implications of accepting such an argument. The SEC's "simultaneous" position would be an end-run around Congress' clear proscription of the SEC's antifraud authority. If the SEC wishes to obtain authority over non-security-based swaps, it must do so by convincing Congress to provide such authority through legislation.

2003).  Such an argument must fail if made here because it assumes a "factual" attack on subject matter jurisdiction, *i.e.*, the defendant is disputing the complaint's factual allegations.  In fact, Mr. MacFaddin's challenge is a "facial" attack, as there can be no dispute about any facts relevant to the Court's subject matter jurisdiction.

>    a.    **The Court May Address Mr. MacFaddin's Motion To Dismiss At This Stage Because It Is A "Facial" Attack To Subject Matter Jurisdiction**

A district court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Williamson v. Tucker*, 645 F.2d 404, 413, 416 (5th Cir.  1981) (finding that "as a general rule a claim cannot be dismissed for lack of subject matter jurisdiction because of the absence of a federal cause of action.").  Attacks on subject matter jurisdiction under Rule 12(b)(1) come in two forms, "facial" and "factual" attacks.  *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990).  Facial attacks challenge subject matter jurisdiction based on the allegations in the complaint, and the district court takes the allegations as true in deciding whether to grant the motion.  *Id.* at 1529.  Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings.  *Id.*

- 26 -

The Eleventh Circuit has stated that a district court should not consider a <u>factual</u> challenge to its subject matter jurisdiction when such a challenge also implicates the merits of the plaintiff's underlying claims.  *See, e.g.*, *Morrison*, 323 F.3d at 925.  However, this rule has no applicability to facial challenges to a court's subject matter jurisdiction.  *See McElmurray v. Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007) (affirming district court's dismissal of complaint for lack of subject matter jurisdiction because "the district court here treated the motion to dismiss as a facial attack and considered only the complaint and the attached exhibits" and no facts were in dispute).  "A challenge to the court's subject matter jurisdiction can properly be resolved on undisputed facts, even if such a challenge involves a direct attack on the merits of plaintiff's claim." *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 742 (11th Cir. 2005) (addressing whether contracts constitute "securities" as defined by the Securities Act and Exchange Act in resolving motion to dismiss for lack of subject matter jurisdiction).

> **b.** **The Court May Take Judicial Notice Of Facts Where A Defendant Mounts A Facial Attack To Subject Matter Jurisdiction**

A court faced with a facial attack in a motion to dismiss is not precluded from considering facts outside the complaint if such facts are the proper subject of judicial notice.  *See OJO v. Farmers Group, Inc*., No. CV 05-5818-JFW,

2006 WL 4552707, *3 n.21 (C.D. Cal. Mar. 7, 2006) (court may take judicial notice in facial challenge to subject matter jurisdiction), *rev'd on other grounds*, 565 F.3d 1175 (9th Cir. 2007); *Acierno v. Haggerty*, No. Civ. A. 04-1376-KAJ, 2005 WL 3134060, *5 (D. Del. Nov. 23, 2005) (same).  Moreover, the fact that a court takes judicial notice of facts outside the complaint does not transform a facial attack into a factual attack.  *See Doe v. Mann*, 285 F.Supp.2d 1229, 1232 (N.D. Cal. 2003) (in evaluating a facial attack, "the court looks to the complaint and attached documents, as well as to facts that are judicially noticeable or undisputed"), *aff'd* 415 F. 3d 1038 (9th Cir. 2005).  Furthermore, the fact that a court takes judicial notice of facts not contained in the complaint does not transform a motion to dismiss into one for summary judgment.  *See, e.g*., *Acierno*, 2005 WL 3134060 at *6;  *OJO*, 2006 WL 4552707 at *3.

The Court may take judicial notice of information outside of a complaint that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."  FED. R. EVID. 201(b) (2009).  In considering motions to dismiss, courts routinely take judicial notice of publicly-available information contained in publications and websites that is not subject to reasonable dispute and is capable of ready determination.  *See, e.g*., *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (noting that court may take judicial notice at any time, and district

court abused discretion in deciding not to take judicial notice of information on government website); *Termarsch v. Argent Mortgage Co., LLC*, No. 8:07-CV-1725-T-30TBM, 2008 WL 1776592, *4 n.4 (M.D. Fla. April 16, 2008) (taking judicial notice of information from Wells Fargo Bank's website); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224-25 (10th Cir. 2007) (upholding district court's decision to take judicial notice of information on party's website concerning financial information); *Doron Precision Sys., Inc. v. FAAC, Inc*., 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute 'and it is capable of accurate and ready determination.'") (citations omitted); *St. Matthew's*, 2005 WL 1199045 at *13 (taking judicial notice of information from British Bankers' Association website showing that LIBOR is an index of interest rates).

Information contained on SIFMA's website with respect to the SIFMA Index, on the ISDA website with respect to swap agreements generally, on the MSRB's website with respect to terms used in the municipal securities - industry, and documents contained on the websites of other organizations whose accuracy cannot be reasonably questioned, are proper subjects of the Court's judicial notice.

c.      **There Can Be No Genuine Dispute About Any Facts Relevant To The Court's Determination Of Subject Matter Jurisdiction**

Here, Mr. MacFaddin asserts only a facial challenge to the Court's subject matter jurisdiction because facts concerning the SIFMA Index and the terms of the Swaps – which are the only facts relevant to the Court's determination of its subject matter jurisdiction – cannot be disputed and do not conflict with the Complaint's factual allegations.   Mr. MacFaddin only disputes the SEC's bare legal conclusion that the SIFMA Index is an "index of securities."  (Compl. ¶ 18.) While the SEC couches this legal conclusion about the SIFMA Index as a fact, this sleight of hand cannot provide a route by which the SEC may escape dismissal of the Complaint as to the Swaps, which are not subject to the SEC's antifraud jurisdiction.  *See supra* Section I.A.1.  The Court is not required to accept such conclusions on a motion to dismiss, even where the facts alleged in the complaint are accepted as true.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) ("Courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'") (*quoting Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.") (citation omitted).

Just because the SEC alleges that the SIFMA Index is "an index of securities" does not make the claim a fact.  (Compl. ¶¶ 18-19.)  A "fact" is "a circumstance, event or occurrence as it actually takes or took place . . . [a]n actual and absolute reality, as distinguished from mere supposition or opinion."  BLACK'S LAW DICTIONARY 592 (6th ed. 1990).  The SEC's characterization of the SIFMA Index as an "index of securities" is a legal conclusion based on a number of actual facts, and thus the Court need not accept this conclusion in determining whether it lacks subject matter jurisdiction.  *See Twombly*, 550 U.S. at 555-56.  The Court need only interpret and apply the indisputable facts discussed in Section I.A.1. above to applicable law, which involves a legal determination that rests within the exclusive province of the Court.  The Court can obviously do so at this stage of the proceeding.  *See, e.g., Mut. Benefits*, 408 F.3d at 742 ("[T]he question whether . . . viatical settlement contracts qualify as 'investment contracts' under the Securities Acts can properly be answered on the undisputed facts presented by the record in this case.").

There is no genuine dispute as to the following facts, which are the only facts in the Complaint relevant to the SEC's claim that subject matter jurisdiction exists with respect to the Swaps:

(1)    the County entered into a swap transaction with JPMorgan on March 28, 2003 (*see* Compl. ¶ 50);

    (2)      the terms of the March 2003 Swap stated that the County was entitled to receive floating interest rate payments from JPMorgan based in part on the SIFMA Index (*see id.* ¶ 18);

    (3)      the County entered into a swap transaction with JPMorgan on July 14, 2003 (*see id.* ¶ 73);

    (4)      the terms of the July 2003 Swap stated that the County was entitled to receive floating interest rate payments from JPMorgan based in part on the SIFMA Index (*see id.* ¶ 18);

    (5)      the County entered into a swap transaction with JPMorgan on November 7, 2003 (*see id.* ¶ 89); and

    (6)      the terms of the November 2003 Swap stated that the County was to make interest rate payments to JPMorgan based on the SIFMA Index (*see id.* ¶ 19).

As was made clear in Section I.A.1. above, these facts, when considered in conjunction with facts about the SIFMA Index, which are properly the subject of the Court's judicial notice, demonstrate that the Court lacks subject matter jurisdiction over the SEC's claims with respect to each of the Swaps.

**B.**    **The Complaint Fails To State A Claim Upon Which Relief Can Be Granted With Respect To Counts I – IV**

In addition to the Court's lack of subject matter jurisdiction over Counts I – III with respect to the Swaps (*see* Section I.A.), Counts I – IV of the Complaint also should be dismissed because they fail to state a claim upon which relief can be granted and because their factual bases are not pleaded with sufficient particularity.  The SEC Complaint impermissibly uses innuendo in place of direct

allegations of fact and fails to specify facts against Mr. MacFaddin with the requisite particularity.

Specifically, and as discussed in more detail below, Counts I – IV of the Complaint fail pursuant to Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"), because the Complaint fails to allege with sufficient particularity that Mr. MacFaddin was responsible for any of the alleged misrepresentations or omissions.  Moreover, Counts I – IV of the Complaint must also be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") for failing to state a claim because the Complaint fails to establish that (1) the Swaps are subject to the Antifraud Statutes; (2) Mr. MacFaddin had any duty to disclose with respect to either the Warrants or the Swaps; (3) Mr. MacFaddin was responsible for any of the alleged misrepresentations or omissions; and (4) Mr. MacFaddin acted negligently or with scienter.

## 1.    Elements of Counts I – IV And The Motion to Dismiss Standard

In order to prove a violation of the Antifraud Statutes, the SEC must prove that there has been:

> (1) a misrepresentation or omission, (2) that was material, (3) which was made in the offer and sale of a security [Section 17(a)(1)] or in connection with the purchase or sale of securities [Section 10(b) and Rule 10b-5], (4) scienter, and (5) the involvement of interstate commerce, the mails, or a national securities exchange.

*SEC v. Solow*, No. 06-81041 CIV, 2007 WL 1970806, *2 (S.D. Fla. May 10, 2007) (citations omitted), *aff'd*, No. 08-13014, 2009 WL 139503 (11th Cir. Jan. 21, 2009). Sections 17(a)(2) and (3) have the same elements as Section 17(a) and Section 10(b), but do not require a showing of scienter. *Aaron v. SEC*, 446 U.S. 680, 697 (1980). Instead, Sections 17(a)(2) and (3) require the plaintiff to show that the defendant made the material misrepresentations or omissions with negligence. *See, e.g.*, *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citing *Aaron*, 446 U.S. at 702). So too, the elements required to establish a violation of Rule G-17 are co-extensive with those of section 17(a). A "violation of [S]ection 17(a) is not appreciably distinct from a violation of Rule G-17, so the Court need not consider Rule G-17 separately." *U.S. SEC v. Fitzgerald*, 135 F. Supp. 2d 992, 1027 n.11 (N.D. Cal. 2001) (citing *SEC v. Cochran*, 214 F.3d 1261, 1264 n.2 (10th Cir. 2000)).

When considering a motion to dismiss pursuant to Rule 12(b)(6), "a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *American United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). However, the Complaint must meet the pleading standard recently articulated by the Supreme Court in *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Twombly*, 550 U.S. at 555-56. "Courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986)). "'[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action' [] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216 (3d ed. 2004)). As the Supreme Court recently stated in *Ashcroft*:

> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief."

129 S.Ct. at 1950 (citations omitted).

### 2.     Counts I – IV Of The Complaint Must Be Dismissed Because The Complaint Fails To Plead Fraud With Particularity As Required By Rule 9(b)

Claims sounding in fraud are subject to the heightened pleading requirements of Rule 9(b). *See, e.g.*, *SEC v. Physicians Guardian Unit Inv. Trust,*

*ex rel.*, 72 F. Supp. 2d 1342 (M.D. Fla. 1999) (applying Rule 9(b) to fraud claims brought pursuant to Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5); *see also Fitzgerald*, 135 F. Supp. 2d at 1027 n.11 (a "violation of [S]ection 17(a) is not appreciably distinct from violation of Rule G-17").  To meet the requirements of Rule 9(b), a complaint must set forth:

> "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks*, 116 F.3d at 1371) (internal quotation marks omitted));[33] *see also Scrushy*, 2005 WL 3279894 at *2.  Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral or fraudulent behavior." *Ziemba*, 256 F.3d at 1202 (internal quotations omitted).

At its core, this is an omission case; the SEC alleges that JPMorgan failed to disclose to "the County" and warrant investors that payments were being

---

[33] While this standard arose in actions brought by private litigants, courts in the Eleventh Circuit have applied it in actions brought by the SEC.  *See, e.g.*, *SEC v. Dauplaise*, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, *5 (M.D. Fla. Feb. 22, 2006); *SEC v. Dunlap*, No. 01-8437-CIV, 2002 WL 1007626, *2 (S.D. Fla. March 27, 2002); *Scrushy*, 2007 WL 3279894 at *2.

made to certain County advisors who were performing little or no work.  However, the Complaint fails to plead fraud against Mr. MacFaddin with the required particularity, because it does not allege that Mr. MacFaddin was "responsible for making" any of the alleged omissions.  Instead, the Complaint merely alleges that certain documents provided to, or communications with, the County and warrant investors contained omissions (including the official statements for the Warrants and the confirmations for the Swaps) without specifically alleging that Mr. MacFaddin (1) was responsible for, (2) had any role in the preparation or distribution of, or (3) was even aware of, any of these documents.

Rather than making specific allegations regarding what, if any, omissions Mr. MacFaddin was responsible for making, the Complaint makes the following allegations, without attribution:

- "[T]he official statement for the 2002-C bonds disclosed the roles of numerous deal participants, including the underwriters, underwriters' counsel, bond counsel, structuring agent, and the County's financial and swap advisors. . . . However, the official statement did not disclose the payments to ABI Capital and Gardnyr Michael."  (Compl. ¶ 39.)

- "The official bond offering statement listed and defined the identities and roles of numerous deal participants, including the underwriters, bond counsel, underwriters' counsel, and the County's financial advisor.  It further disclosed underwriting fees of $4.5 million to J.P. Morgan Securities and $681,401 to a co-underwriter.  But it did not mention the three firms receiving the payments."  (*Id.* ¶ 55.)

- "The bond offering official statement also listed the roles of all participants the County had selected, including the underwriters, bond counsel, the underwriters' counsel and the County's financial advisor. . . . But the official

- 37 -

statement omitted Blount Parrish's $2.6 million payment and the $250,000 payments to the other two firms."  (*Id.* ¶ 76.)

- "The 2003-C swap agreement . . . , dated July 14, 2003, did not disclose the fees.  It contained an itemized fee section listing payments JPMorgan was making to the County's swap advisor ($363,750), legal counsel ($187,500), and financial advisor ($37,500), but omitted the Blount Parrish, Gardnyr Michael and ABI Capital payments."  (*Id.* ¶ 78.)

- "The [November 2003 Swap] confirmation also did not mention those payments, or the fact that JPMorgan was incorporating those fees into the pricing of the transaction."  (*Id.* ¶ 92.)

This tactic of alleging only what particular documents say, without specifically attributing the documents to Mr. MacFaddin, does not meet the requirements of Rule 9(b).  *See Cordova, v. Lehman Bros., Inc.,* 526 F. Supp. 2d 1305, 1313 (S.D. Fla. 2006) (finding that complaint fails to satisfy Rule 9(b) where "Plaintiffs allege that marketing materials or documents made the representations," because such allegations "obscure[] who was responsible for a given representation, because Plaintiffs do not identify specific wording or indicate to whom the statement was attributable."), *aff'd in part, vacated in part sub nom. Puterman v. Lehman Bros., Inc.*, 332 F. App'x 549 (11th Cir. 2009).[34]

---

[34] In certain circumstances, "'to circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent,'" *In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (quoting *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004)), securities fraud plaintiffs may rely for pleading purposes on the "group pleading doctrine" (also known as the "group published information doctrine"), a presumption that certain statements made in "group published information" are the collective work of the executives or directors typically involved in producing such information, *see, e.g., SEC v. Yuen*, 221 F.R.D. 631, 635 (C.D. Cal. 2004).  Noting the tension between the group pleading doctrine and Rule 9(b), some courts reject the doctrine outright.  *See, e.g., D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 n.11 (E.D. Mich.  2003).  In any event, this presumption is

Rather than specifically alleging that Mr. MacFaddin distributed, or was responsible for distributing, the warrant official statements to investors or swap confirmations to the County, the Complaint alleges:

- "In its role as managing underwriter, J.P. Morgan Securities offered and sold the 2002-C bonds to investors.  In doing so, J.P. Morgan Securities transmitted the official statement to investors.  The official statement did not disclose to bond investors the material information concerning the payments to ABI Capital and Gardnyr Michael, or the conflict of interest raised by the agreement to make the payments to secure JPMorgan's selection as managing underwriter and swap provider."  (Compl. ¶ 40.)

- "In its role as managing underwriter, J.P. Morgan Securities offered and sold the 2003-B bonds to investors.  The official statement did not disclose to bond investors the material information concerning the payment scheme or

---

rooted in the notion that "plaintiffs charging fraud with respect to corporate utterances seldom have access, prior to the commencement of discovery, to information permitting identification of the particular officers, directors and employees who bear personal responsibility for the utterances in question."  *In re Bisys*, 397 F. Supp. 2d at 438.  In this case, where it is clear from the face of the Complaint the SEC has already received significant discovery, application of the group pleading doctrine would be inappropriate.  *See Yuen*, 221 F.R.D. at 637 ("Had the SEC not been engaged in discovery for several months before asserting claims against the Defendants, then perhaps the SEC's reliance upon the group published information doctrine would not be so objectionable.  However, given the SEC's substantial pre-filing investigatory powers and the significant discovery already conducted in this case, the SEC's reliance upon the 'group published information' doctrine is misplaced and inappropriate.")  Moreover, the group pleading doctrine should not apply to Mr. MacFaddin with respect to the warrants, because, as the Complaint makes clear (*see* Compl. ¶ 9), warrant disclosures were not part of Mr. MacFaddin's day-to-day responsibilities.  *See, e.g.*, *Yuen*, 221 F.R.D. at 635, 637.

As the existence of the group pleading doctrine suggests, where the group pleading doctrine does not apply, conclusory allegations of a defendant's supervisory position in an entity that produces a misstatement or omission, without more, is insufficient to establish that the defendant is responsible for the misstatements or omissions, as required by Rule 9(b).  *See, e.g.*, *id.* at 637 (finding it unreasonable to apply the group pleading doctrine to satisfy the requirements of Rule 9(b), and therefore dismissing complaint, where the SEC argued that the doctrine should be applied based on "conclusory allegations of job title, purported general involvement with the day-to-day activities, and alleged participation in disclosure of public statements.").

the conflict of interest raised by the agreement with Langford to pay $4.4. million to firms on Langford's behalf to secure County business." (*Id.* ¶ 56.)

- "In its role as managing underwriter, J.P. Morgan Securities offered and sold the 2003-C bonds to investors.  In doing so, it transmitted the official statement to investors.  The official statement did not disclose to bond investors the material information concerning the payment scheme and the conflict of interest raised by the agreements with Langford and Smoot to pay $3.1 million to firms on their behalf to influence JPMorgan's selection as managing underwriter and swap provider." (*Id.* ¶ 77.)

- "JPMorgan created and finalized the swap agreement confirmation, which Langford signed on behalf of the County. . . . The confirmation contained an itemized fee section that listed three fees JPMorgan Chase Bank was paying at the County's direction: (1) $165,000 to the County's swap advisor; (2) $250,000 to the County's legal advisor; and (3) $50,000 to the County's financial advisor.  However, omitted from the confirmation was the $3 million payment to Goldman Sachs and the $1.4 million payment to Rice Financial." (*Id.* ¶ 57.)

These allegations also do not meet the requirements of Rule 9(b).  In *Cordova*, the Southern District of Florida ruled that the plaintiffs' complaint failed to meet the requirements of Rule 9(b), in part, because plaintiffs did not "state clearly how [specific misrepresentations, omissions or actions were] attributable, on which occasions or in which documents, to specific individual [d]efendants." 526 F. Supp. 2d at 1313; *see also SEC v. Roanoke Tech. Corp.*, No. 6:05-cv-1880-Orl-31KRS, 2006 WL 3813755, *6 (M.D. Fla. Dec. 26, 2006) (stating that if the SEC chose to replead counts dismissed pursuant to Rule 9(b), it "must specify, as to [defendant], the fraudulent statements or omissions he made, when and to whom the statements were made (or, as to omissions, not made), whom the statements or

omissions were intended to influence, and what transactions they were made in connection with."); *Scrushy*, 2005 WL 3279894 at *1 ("HealthSouth Corporation is no longer a party to this litigation.   Therefore, all references to HealthSouth Corporation, where there is no specific allegation that defendant Scrushy was acting on behalf of and for said corporation, are improper.").

In sum, the Complaint's allegations regarding Mr. MacFaddin with respect to the documents allegedly containing the omissions are not sufficient to put Mr. MacFaddin on notice of the particular wrongdoing in which he is alleged to have engaged and risk subjecting Mr. MacFaddin to "spurious charges of immoral or fraudulent behavior."  *See Ziemba*, 256 F.3d at 1202; *see also Roanoke Tech. Corp.*, 2006 WL 3813755 at *5 (finding that vague allegations failed to satisfy Rule 9(b) and that defendant "should not have to defend himself against [] an amorphous mass of allegations" where "everything is lumped together and [the defendant] (and [the] Court) are left to figure out the outlines of the plot" and where, "depending on the details of the scheme, . . . [the defendant's] obligation to correct a misrepresentation might vary.") (footnote omitted).

### 3.    Counts I – IV Of The Complaint Must Be Dismissed Pursuant To Rule 12(b)(6) Because The Complaint Fails To State A Claim

While Counts I – IV of the Complaint must be dismissed because they fail to plead fraud with sufficient particularity, those Counts must also be

dismissed pursuant to Rule 12(b)(6) because they fail to state a claim for which relief can be granted.

### a. Counts I – III Fail To State A Claim As To The Swaps Because The Swaps Are Not Subject To The Antifraud Statutes

As demonstrated in Section I.A.1. above, the Swaps are not securities or security-based swap agreements subject to the Antifraud Statutes.  As a result, the SEC cannot allege at this stage, and therefore will be unable to ultimately prove at any stage, an essential element of its fraud claims against Mr. MacFaddin based on his conduct in connection with the Swaps.  Therefore, the SEC's claims against Mr. MacFaddin should be dismissed for failure to state a claim to the extent that they allege violations of the Antifraud Statutes with respect to Mr. MacFaddin's conduct in connection with the Swaps.

### b. The Complaint Fails To Allege Sufficient Facts To Establish That Mr. MacFaddin Had Any Duty To Disclose, And Therefore Does Not Allege An Actionable Omission

The Complaint must be dismissed as to Mr. MacFaddin, because Mr. MacFaddin had no duty to disclose with respect to either the Warrants or the Swaps.  "[S]ilence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b) . . . [b]ut such liability is premised on a duty to disclose . . . arising from a relationship of trust and confidence between parties to a transaction."  *Chiarella v. United States*, 445 U.S. 222, 230 (1980); *see*

*also Ziemba*, 256 F.3d at 1206 (11th Cir. 2001) (a "'defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose.'") (citation omitted).  Generally, a duty to disclose arises when (1) there is a fiduciary or similar relationship between the parties; or (2) a defendant has made an omission that renders a statement misleading.  *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944, 945 (7th Cir. 1989) (bank did not have independent duty to disclose to investors because it had no relationship with them).  Conversely, where two parties' prior dealings do not give rise to a confidential relationship, and one party does not serve in a transaction as an agent, fiduciary, or a person in whom trust and confidence is reposed, no duty to disclose arises.  *See Chiarella*, 445 U.S. at 232; *In re Cascade Int'l Sec. Litig.*, 840 F. Supp. 1558, 1564 (S.D. Fla. 1993), *aff'd sub nom. Ziemba v. Cascade Int'l Inc.*, 256 F.3d 1194 (11th Cir. 2001) (where fiduciary relationship has not been established, no duty to disclose exists); *see also Gewin v. TCF Asset Mgmt. Corp.*, 668 So. 2d 523, 528 (Ala. 1995) (no duty of disclosure found where parties negotiated at arms' length); *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1191-93 (Ala. 2008) (holding that bank officials owed no fiduciary duty, and hence no duty of disclosure, to bank customers, despite advising customers as to how best to run their business).  "[A] fiduciary obligation is not to be lightly implied, lest it undercut the basic principles of commercial law."  *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006).

The Complaint suggests that omissions were made to the County and warrant investors with respect to the Warrants and to the County with respect to the Swaps.  (*See* Compl. ¶ 5.)  Therefore, for the SEC to state a claim against Mr. MacFaddin for the alleged omissions, it must allege facts sufficient to establish that Mr. MacFaddin had a duty to disclose to the County with respect to the Swaps and to the County and the warrant investors with respect to the Warrants.  *See Ziemba*, 256 F.3d at 1206-1207 (affirming dismissal of complaint where plaintiff had failed to allege sufficient facts to establish a duty to disclose).[35]  As discussed in more

---

[35] To the extent that the SEC argues that the bond and swap transactions were "one deal" and therefore it need only establish that Mr. MacFaddin had a duty to disclose with respect to that single deal, this attempt at an end-run to regulate transactions which Congress has explicitly prohibited it from regulating should be rejected.  The law and even the Complaint itself make clear that this argument is fatally flawed.

First, as discussed in Section I.B.3.b.ii.(A), *infra*, the Complaint makes clear that the contemporaneous warrant and swap transactions were separate transactions.  Furthermore, as discussed in Section I.A.1.c.iii., *supra*, in spite of its argument that the contemporaneous warrant and swap deals were part of the same transaction, the SEC *itself* treats the 2002-C Warrants and the October 2002 Swap as distinct transactions.

Second, the Court does not need to accept as true the SEC's allegation that the bond and swap transactions were each part of a single deal.  This is a legal conclusion and an unwarranted factual deduction.  *See Twombly*, 550 U.S. at 555 ("Courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'") (quoting *Papasan*, 478 U.S. at 286); *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.") (citation omitted).  As discussed in Section I.A.1.c.iii., *supra*, it is also an *incorrect* legal conclusion.

From the foregoing, it is clear that the warrant transactions and swap transactions were distinct.  In these circumstances, the Court must analyze separately whether Mr. MacFaddin owed a duty to the County (on the swap transactions) or to the County and/or the warrant purchasers (on the warrant transactions).  *See United States v. Cochran*, 109 F.3d 660, 665-666 (10th Cir. 1997) ("While it is true that [defendant] was co-managing underwriter of the bonds . . . , the notion that

detail below, it is clear that Mr. MacFaddin did not owe any duty to disclose to either the County or the warrant investors.

   **i.**  **The Complaint Fails To Allege That Mr. MacFaddin Had Any Duty To Disclose With Respect To The Swaps**

   There are no regulations requiring affirmative disclosures for swap agreements under the securities laws.   Presumably, this is because the SEC is prohibited from regulating swaps.  *See supra* Section I.A.1.   Moreover, the Complaint does not and cannot allege sufficient facts to establish that Mr. MacFaddin or the Municipal Derivatives Department performed functions or represented itself as having a role that would give rise to any fiduciary or special relationship with the County on the Swaps, which would give rise to a duty to disclose.  *See Chiarella*, 445 U.S. at 230.   This is because there was no such relationship.   As discussed in more detail below, the County together with its multiple sets of advisors, negotiated the terms of the Swaps at arms' length with JPMorgan and specifically disclaimed any fiduciary relationship.   Under these circumstances, Mr. MacFaddin could not have any duty to disclose to the County with respect to the Swaps.

   The Swaps between the County and JPMorgan Chase Bank were governed by contract and Mr. MacFaddin and others at JPMorgan who worked on

this engagement somehow extended gratuitously to reinvestment of $54 million in bond proceeds is . . . unsupported . . . ").

those swaps were required to do nothing more than the precisely-defined and expressly-circumscribed duties defined in that contract.  *See* Ex. 7, ISDA at § 4(a), Schedule Part 2; Ex. 5, Confirmation of the March 2003 Swap, p. 5; Ex. 6, Confirmation of the July 2003 Swap, p. 5.   The ISDA and each of the Confirmations make explicitly clear that (1) the County did not rely on JPMorgan in the course of agreeing to either the March 2003 Swap or the July 2003 Swap; and (2) JPMorgan was not acting as a fiduciary or advisor to the County on either the March 2003 Swap or July 2003 Swap.   In both the ISDA and each of the Confirmations the County represents that (1) it is "acting for its own account and [] has made its own independent decision to enter into that Swap Transaction and as to whether that swap transaction is appropriate for it based upon its own judgment and upon advice from such advisors as it has deemed necessary"; and (2) JPMorgan "is not acting as a fiduciary for or an advisor to [the County] in respect of that Swap Transaction."  Exs. 5 and 6, Confirmations at § 6(a), (c); Ex. 7, ISDA, U.S. Municipal Counterparty Schedule to the Master Agreement, at 11.  In *Erie*, 2009 WL 234128 at *2-3, the Southern District of New York found that the exact same contract language – which appears in both the ISDA and the Confirmations – precluded a duty to disclose.  *See also Cooper v. Parsky*, 140 F.3d 433, 440-41 (2d Cir. 1998) (contractual waiver of fiduciary duty foreclosed finding of fiduciary relationship); *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 944 F.

Supp. 1169, 1177-78 (S.D.N.Y. 1996) (no fiduciary relationship existed as a matter of law where contract contained explicit disclaimer of fiduciary relationship).  It is clear from these documents alone that Mr. MacFaddin did not have a duty to disclose in connection with the Swaps.

Moreover, the ISDA governed any notice and confirmation obligations between JPMorgan and the County with respect to the Swaps.  The counterparties were obligated to provide each other with specifically identified information, none of which concerns the identities of participants in the swap transactions or their compensation.  *See* Ex. 7, ISDA at § 4(a), Schedule Part 2.  The ISDA did not require any fee-related information to be included in the confirmations.  *See id*.  Finally, under the terms of the ISDA, the "side letters" <u>were</u> part of the "Confirmation," as that term is defined in the ISDA, for each swap transaction.  *See* Ex. 7, ISDA, at 1 ("documents <u>and other confirming evidence</u> (each a 'Confirmation')") (emphasis added).  Because all of the confirming documents together constitute the swap Confirmation, the allegedly undisclosed fees <u>were</u> included in the Confirmation for each swap transaction.  To the extent that the County or its advisors were not happy with the confirmation scheme outlined by the ISDA, they could have negotiated for a more specific structure, but the binding terms of the ISDA and the Confirmations are clear and JPMorgan, and Mr. MacFaddin, fully complied with them.

Additionally, there are numerous allegations in the Complaint that reinforce the fact that the parties engaged in arms' length negotiation for all of the Swaps. As discussed in the Complaint, in addition to the County's advisors at the heart of the SEC's fraud allegations, for each of the swap transactions, the County retained a swap advisor, legal counsel, and a financial advisor to protect its interests with respect to the Swaps. (*See* Compl. ¶¶ 23, 57, 78, 91.) There is no allegation that these advisors performed no services for the County. In fact, there are allegations suggesting that they were heavily involved in the negotiations between the County and the Municipal Derivatives Department. (*See, e.g.*, Compl. ¶¶ 22-23.) Where a sophisticated entity like the County, together with its multiple sets of advisors, engages in an arms' length transaction, there is no duty to disclose. *See Kloder v. Bennett*, No. 89-3430, 1990 U.S. App. LEXIS 11591, *15-16 (6th Cir. July 9, 1990) ("The plaintiffs[] . . . are relatively sophisticated businessmen who have negotiated contracts before. As arms-length negotiators, the plaintiffs[] were in a position to clarify or define [a contract term with a trade usage the defendant allegedly withheld] but simply acquiesced. We decline to impose on [the defendant] a duty to disclose of the magnitude that the plaintiffs[] now urge."); *United States v. Hunt*, No. 05-CR-395-DAB, 2006 U.S. Dist. LEXIS 64887, *13 (S.D.N.Y. Sept. 6, 2006) ("A fiduciary relationship means that the fiduciary agrees to act as a principal's 'alter ego,' rather than assuming the

standard arm's length stance of traders in a market.") (citation omitted); *see also Cascade Int'l*, 840 F. Supp. at 1564.

Given these facts, to find that the Municipal Derivatives Department and Mr. MacFaddin owed a duty to disclose in connection with the swap agreements would "undercut the basic principles of commercial law." *Skelly*, 442 F.3d at 98. It would introduce uncertainty into the negotiations of parties dealing at arms' length and, in this case, would effectively re-write the parties' contracts to impose a duty in derogation of the parties' express intent to the contrary. Moreover, the duty that it would impose – essentially requiring swap providers to investigate the extent and quality of the advice given by advisors of their counterparties – would be burdensome and possibly unworkable in an arms' length negotiation; parties will naturally be reluctant to have their counterparties inquiring of their advisors what sorts of advice they have provided. The Court should not create such a duty here.

ii.    **The Complaint Fails To Allege That Mr. MacFaddin Had Any Duty To Disclose With Respect To The Warrants**

As part of the SEC's heretofore described attempt to expand its jurisdiction, the SEC has claimed that Mr. MacFaddin is liable in connection with the Warrants. A close reading of the Complaint's non-conclusory allegations makes clear that Mr. MacFaddin was not involved in the offer, purchase or sale of

these warrants or the disclosures that accompanied their issue.  However, the SEC has deliberately attempted to conflate contemporary warrant and swap transactions in order to assert claims against Mr. MacFaddin based on the Warrants.  Despite these efforts, the Complaint fails to allege sufficient facts to establish that Mr. MacFaddin had a duty to disclose to any party in connection with the warrant issuances.

> **(A)** **The Allegations Of The Complaint Are Insufficient To Establish That Mr. MacFaddin Was Involved In The Offer, Purchase, Or Sale Of The Warrants, Or The Disclosures That Accompanied Their Issue**

The face of the Complaint makes clear that (1) the Warrants and Swaps were separate transactions (*see, e.g.*, Compl. ¶¶ 12-14, 25-26;) (2) overseen by different departments at JPMorgan (*see, e.g.*, *id.* ¶¶ 3, 8-9, 29;) (3) on behalf of different JPMorgan entities (*see., e.g.*, *id.* ¶¶ 3, 5;) (4) with different sets of customers (*see, e.g.*, *id.* ¶ 5;) (5) negotiated with different sets of advisors to the County (*see, e.g.*, *id.* ¶¶ 23, 39, 54-55, 57, 75-76, 78, 91;) and (6) with separate closings (*see, e.g.*, *id.* ¶¶ 50, 73.)  Moreover, it alleges that Mr. LeCroy was "responsible for J.P. Morgan Securities' entire municipal bond business in the firm's Southeast Region," while Mr. MacFaddin "served as managing director and head of J.P. Morgan Securities' Municipal Derivatives Department" and "supervised the firm's entire municipal derivatives operations, including those

people responsible for negotiating all swap agreements JPMorgan Chase Bank entered into." (*Id.* ¶¶ 8, 9.)

Despite these clear distinctions between the warrant and swap transactions and Mr. LeCroy and Mr. MacFaddin's areas of responsibility, the SEC repeatedly makes allegations to the effect that "LeCroy and MacFaddin actively solicited the County . . . to hire JPMorgan as underwriter on a new [] sewer bond offering and to enter into another swap agreement." (Compl. ¶ 48; *see also id.* ¶¶ 30, 31, 48, 52, 71.) No matter how many times the SEC repeats these "'naked assertion[s]' devoid of 'further factual enhancement,'" the Court need not accept them as true for purposes of this motion to dismiss. *Ashcroft*, 129 S.Ct. at 1939 (2009) (allegations that one defendant was the "principal architect" of, and another was "instrumental" in, allegedly unconstitutional policy were conclusory). Moreover, these allegations are equivocal about whether the SEC is even alleging that MacFaddin was involved in soliciting the County (or negotiating with the County, as the case may be) with respect to the Warrants. They are consistent with the fact that Mr. MacFaddin <u>only</u> interacted with the County in connection with the swaps, the area of Mr. MacFaddin's responsibility at JPMorgan. (*See* Compl. ¶ 9.) Indeed, the SEC only makes <u>one</u> allegation regarding Mr. MacFaddin and the Warrants without also mentioning swaps, and later allegations in the Complaint make clear that that one instance is misleading. Paragraph 31 states that "[t]he

scheme began in earnest in July 2002, when LeCroy and MacFaddin solicited the County on behalf of J.P. Morgan Securities for a $1.4 billion sewer bond deal." However, it is clear from other allegations in the Complaint – (*see, e.g.*, Compl. ¶ 34 ("The largest of the three transactions, the $839 million 2002-C deal, used a combination of auction rate bonds and interest rate swap agreements")) – that there was a swap transaction executed contemporaneously with the 2002-C Warrants, which Mr. MacFaddin executed on behalf of JPMorgan Chase, (*id.* ¶ 39.)  *See United States ex rel. Carroll v. JFK Med. Ctr.*, No. 01-8158-CIV, 2002 WL 31941007, *2 (S.D. Fla. Nov. 15, 2002) (the "Court need not accept facts that are internally inconsistent . . . ").  Such allegations are insufficient to establish that Mr. MacFaddin was involved in the offer, purchase or sale of the Warrants or the disclosures that accompanied their issue.

> **(B)    The Complaint Fails To Establish That Mr. MacFaddin Had Any Duty To Disclose To The Warrant Purchasers**

Any duty to disclose that JPMorgan owed to warrant purchasers based on its role as underwriter did not attach to Mr. MacFaddin.  The case law makes clear that the duty an underwriter owes to bond investors and securities purchasers arises from the underwriter's relationship with the bond purchasers.  *See, e.g., Shores v. M.E. Ratliff Inv. Co.*, No. CA 77-G-0604-S, 1982 WL 1559, *3 (N.D. Ala. 1982).  Courts have held that an underwriter has a duty to the investors to

which it sells securities to investigate the issuer and the issuer's securities, and make truthful and complete statements in the information it provides to investors. *See, e.g., Shores*, 1982 WL 1559 at *3. However, this duty arises because of the underwriter's relationship with the individual securities purchasers. *See Sanders v. John Nuveen & Co.*, 524 F.2d 1064, 1069-70 (7th Cir. 1975), *vacated and remanded on other grounds*, 425 U.S. 929 (1976). The underwriter's duty arises from the fact that the underwriter's sale of the securities to the investor implicitly involves a favorable recommendation of the securities. *See Shores*, 1982 WL 1559 at *3.

The Municipal Derivatives Department, and Mr. MacFaddin did not have this relationship with warrant investors. As discussed in Section I.B.3.b.ii.(A), *supra*, the Complaint makes clear that the warrant and swap transactions were distinct. *See supra* Section I.B.3.b.ii.(A). Moreover, as discussed in more detail in Section I.B.2., *supra*, the Complaint does <u>not</u> allege that Mr. MacFaddin, or anyone in the Municipal Securities Department, was at all involved in the preparation of the disclosure documents in connection with the warrant issuances. *See supra* Section I.B.2.. While paragraph 22 of the Complaint, in attempting to establish personal jurisdiction and venue in the Northern District of Alabama, states conclusorily that "LeCroy and MacFaddin negotiated the terms of the bond offering documents and swap agreements at issue

with or in the County," the specific allegations in the Complaint do not fill out or provide any details which support this bare allegation.[36]  Additionally, while it is clear from the face of the Complaint that the SEC has obtained significant discovery already, the only allegations that the SEC is able to make regarding Mr. MacFaddin's involvement in the Warrants specifically – to the extent they can even be interpreted as such – are conclusory and therefore insufficient to state a claim against Mr. MacFaddin.

While JPMorgan served as both underwriter and swap provider on the relevant transactions, any duties of disclosure imposed on JPMorgan's investment bankers did not gratuitously flow over to Mr. MacFaddin simply because JPMorgan served in a dual role.  *See Cochran*, 109 F.3d at 666.  The Municipal Derivatives Department entered into interest rate swaps with the County.  The County was the sole relevant "investor" with respect to the Swaps.  There is no basis for imposing a duty to disclose on the Municipal Derivatives Department and Mr. MacFaddin with respect to the County's warrant investors.

### (C)    Mr. MacFaddin Had No Duty To Disclose To The County

As discussed in Section I.B.3.b.ii.(A), the Complaint fails to make any non-conclusory allegations that Mr. MacFaddin was involved in the offer, purchase

---

[36] Mr. MacFaddin does not contest that this Court has personal jurisdiction or that venue in the Northern District of Alabama is proper.

or sale of the Warrants or the disclosures that accompanied their issue.  Moreover, the Complaint does not contain any allegations that the County and J.P. Morgan Securities, let alone the County and Mr. MacFaddin in particular, had a fiduciary-type relationship or a relationship of "trust and confidence" with respect to the Warrants that would give rise to a duty to disclose.  *Chiarella*, 445 U.S. at 230. The SEC has not alleged facts tying Mr. MacFaddin to the warrant issuances, but, in any event, Mr. MacFaddin has found no case law to the effect that serving as an underwriter, without more, gives rise to a duty to disclose to an issuer.

Moreover, the Complaint makes clear that each of the payments that the SEC contends should have been disclosed were made in connection with swaps.  (*See* Compl. ¶¶ 41, 44, 53, 85-87, 93.)  There has never been a requirement that an underwriter in a warrant deal disclose in an official statement fees paid on swaps, and such an obligation would impose a new standard for bond disclosures and also result in a major expansion of those included in the special relationship between an underwriter and the investors to which it sells securities.

To hold that the SEC has alleged sufficient facts here to establish that Mr. MacFaddin had a duty to disclose to the County with respect to the Warrants based solely on conclusory allegations regarding Mr. MacFaddin's participation in the solicitation and negotiation of the Warrants, and without making any allegations of a fiduciary-type relationship would go farther than any court has

ever gone to impose a duty to disclose on a defendant in connection with a bond offering.

### c. The Complaint Fails To Allege That Mr. MacFaddin Made Any Actionable Misstatement Or Omission

The fraud-based allegations of the Complaint must also be dismissed because the SEC has failed to plead a sufficient misrepresentation or omission to hold Mr. MacFaddin liable for fraud.  "The question of primary liability for a violation of Section 10(b) and Rule 10b-5 is governed by a 'bright line test,' which means that 'in order for the defendant to be primarily liable under § 10(b) and Rule 10b-5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made.'"  *SEC v. Dauplaise*, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, *5 (M.D. Fla. Feb. 22, 2006) (quoting *Ziemba*, 256 F.3d at 1205); *see also SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 720 (D.N.J. 2005).  "[A] person must actually make the material misstatement or omission and the misrepresentation must be attributed to the specific actor at the time of public dissemination in order to be a primary violator."  *Dauplaise*, 2006 WL 449175 at *5 (quoting *Lucent*, 363 F. Supp. 2d at 720).  "Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."  *Id.*

In this case, the SEC has only specifically attributed the documents with the alleged omissions to "J.P. Morgan Securities" and "JPMorgan." (*See, e.g.*, Compl. ¶¶ 39-40, 51, 54-57, 74-76, 78, 92.) This is not sufficient to state a claim against Mr. MacFaddin. *See Dauplaise*, 2006 WL 449175 at *5-6 (finding that the SEC had made insufficient allegations with respect to defendant's involvement in company's allegedly fraudulent Form 10-Q, where the SEC had alleged that defendant "reviewed and approved" the Form 10-Q, but did not allege that defendant signed or had any involvement in preparing the document); *see also Lucent Techs.*, 363 F. Supp. 2d at 721-24. The Complaint makes clear that MacFaddin "supervised the firm's entire municipal derivatives operations, including those people responsible for negotiating all swap agreements JPMorgan Chase Bank entered into," (Compl. ¶ 9;) there is no non-conclusory allegation that Mr. MacFaddin even knew about the allegedly fraudulent warrant disclosures, let alone that he had a role in preparing them. Moreover, while the Complaint alleges that Mr. MacFaddin sent one letter, it does not allege that Mr. MacFaddin had any specific role in preparing the allegedly fraudulent swap confirmations. Because there is no allegation that Mr. MacFaddin was involved in preparing or even approving the documents with the allegedly fraudulent omissions, the fraud-based claims in the Complaint must be dismissed.[37]

---

[37] The SEC has not alleged that Mr. MacFaddin is liable as an aider and abettor. Presumably,

### d. The Complaint Does Not Allege Sufficient Facts To Establish That Mr. MacFaddin Acted Negligently Or With Scienter

The SEC's claims based on Section 10(b), Rule 10b-5, and Section 17(a)(1) must be dismissed because the Complaint fails to allege sufficient facts to establish that Mr. MacFaddin acted with the requisite scienter.  In the Eleventh Circuit, the standard for scienter is "severe recklessness," which "'is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'"  *MacDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989) (citation omitted).  "'[T]he relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation or conclusory allegations.'"  *SEC v. Espuelas*, 579 F. Supp. 2d 461, 469 (S.D.N.Y. 2008) (quoting *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d. Cir. 1994)).

---

this is because it is unable to satisfy the necessary elements.  For Mr. MacFaddin to be liable for aiding and abetting a violation of Section 10(b) and Rule 10b-5 the SEC must establish (1) the existence of a securities law violation by a primary party (i.e., other than Mr. MacFaddin); (2) that Mr. MacFaddin had "knowledge" of this violation; and (3) that Mr. MacFaddin provided "substantial assistance" to the achievement of the primary violation.  *See Bloor v. Carro*, 754 F.2d 57, 62 (2d Cir. 1985).  Moreover, mere awareness or approval of the primary violation does not constitute "substantial assistance."  *SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006).

In a microcosm of the SEC's action against MacFaddin, paragraph four of the Complaint contains a troubling example of the SEC's overreaching. That paragraph states that "[i]n taped telephone conversations, LeCroy and MacFaddin demonstrated they knew these payments were sham transactions designed to get the broker-dealer and the bank . . . business, referring to them as 'payoffs,' 'giving away free money,' and 'the price of doing business.'" (Compl. ¶ 4.)  However, where those phrases are found in context later in the Complaint, none of them are attributed to Mr. MacFaddin and all of them occurred in conversations to which Mr. MacFaddin was not even a party.  (*See id.* ¶¶ 67, 68, 84.)

As this example of overreaching suggests, the Complaint does not allege that Mr. MacFaddin had scienter. Whether Mr. MacFaddin had scienter depends, in part, on whether he knew that the County advisors were performing "few, if any, services."  (*Id.* ¶ 3.)  However, the Complaint does not plead sufficient facts to establish that Mr. MacFaddin believed that the advisors were doing no work.  First, the Complaint does not specifically allege that Mr. MacFaddin ever visited Jefferson County during the negotiations of the Relevant Transactions.  Second, as is clear from the face of the Complaint, Mr. MacFaddin believed that the recipients of the allegedly undisclosed payments were working at the direction of the County.  (*See id.* ¶¶ 41-44.)  Thus, Mr. MacFaddin was not

privy to the work that the advisors were performing for the County and could not reasonably be expected or required to ascertain that information.   While Mr. LeCroy may have used colorful language regarding the fees to those advisors, the Complaint makes clear that Mr. MacFaddin was not aware of the amount of work the advisors were performing.  In a revealing exchange, Mr. MacFaddin asked Mr. LeCroy whether the advisors were doing work and was told that Mr. LeCroy did not know.  (*Id.* ¶ 43.)  This exchange reflects that (1) Mr. MacFaddin was not in a position to determine the work being done by the advisors, and (2) that he was *not* aware that the advisors did little or nothing.

Moreover, the Complaint makes clear that at least by the beginning of the negotiations for the July 2003 Swap, the "Associate" was the person on the ground on behalf of the Municipal Derivatives Department, and that Mr. MacFaddin had almost no role.  (*See* Compl. ¶¶ 63-93.)   Thus, it was the Associate, not Mr. MacFaddin, who thereafter participated in the swap closings and had conversations with Mr. LeCroy about what was happening in the County. (*See, e.g.*, *id.* ¶¶ 64, 67-70, 79-80, 82-84, 90-92.)   Allegations of conversations between Mr. LeCroy and the Associate are insufficient to establish that Mr. MacFaddin had scienter.  *See, e.g.*, *In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 596 (D.N.J. 2005) ("Mere allegations of knowledge on the

part of subordinates do not provide a sufficient basis for imputing knowledge to executives.") (citation omitted).

The Complaint's lack of allegations sufficient to establish that Mr. MacFaddin had scienter is particularly glaring with respect to the November '03 Swap. There, the Complaint alleges only that (1) Mr. LeCroy told Mr. MacFaddin, approximately three months before the swap transaction closed, that "JPMorgan may 'have to help out' some local firms" (*id.* ¶ 88;) and (2) "LeCroy and MacFaddin negotiated [the allegedly omitted] payments with Langford" (*id.* ¶ 93.) These allegations, one of which is conclusory, are plainly insufficient to establish that Mr. MacFaddin acted with scienter. *See Espuelas*, 579 F. Supp. 2d at 469.

As discussed *supra* in Section I.B.3.b.ii.(A), the allegations of the Complaint fail to establish that Mr. MacFaddin was responsible for the warrant disclosures or was aware of their contents. Therefore, Mr. MacFaddin did not have scienter with respect to the alleged omissions in connection with the warrant issuances. *See SEC v. Rubera*, 350 F.3d 1084, 1095 (9th Cir. 2003) (upholding district court's finding that defendant lacked scienter, in part, because evidence indicated that defendant was not exercising day-to-day oversight over the business that made the misrepresentations and did not know of the misleading statements).

The SEC's claims based on Section 17(a)(2) and (3) must be dismissed because the Complaint fails to allege sufficient facts to establish that Mr.

MacFaddin failed to act negligently.   In the securities context, negligence is a failure to exercise reasonable care and competence.   *See SEC v. Currency Trading Int'l, Inc.*, No. CV 02-05143PA, 2004 WL 2753128, *8 (C.D. Cal. 2004).   For the same reasons that the Complaint does not allege sufficient facts to establish that Mr. MacFaddin acted with scienter, it does not allege sufficient facts to established that he acted negligently.

## II.     CONCLUSION

Based on the foregoing, Mr. MacFaddin respectfully requests that the Court dismiss Counts I – IV of the SEC's Complaint for the following reasons:

- Count I: violation of Securities Act § 17(a)(1): lack of subject matter jurisdiction with respect to the swaps [Rule 12(b)(1)]; failure to state a claim upon which relief can be granted [Rule 12(b)(6); 9(b)].

- Count II: violation of Securities Act §§ 17(a)(2) and 17 (a)(3): lack of subject matter jurisdiction with respect to the swaps [Rule 12(b)(1)]; failure to state a claim upon which relief can be granted [Rule 12(b)(6); 9(b)].

- Count III: violation of Exchange Act § 10(b) and Rule 10b-5: lack of subject matter jurisdiction with respect to the swaps [Rule 12(b)(1)]; failure to state a claim upon which relief can be granted [Rule 12(b)(6); 9(b)].

- Count IV: violation of Exchange Act § 15B(c)(1) and MSRB Rule G-17: failure to state a claim upon which relief can be granted [Rule 12(b)(6); 9(b)].

Dated:  January 15, 2010

Respectfully submitted,


s/Richard F. Lawler
Richard F. Lawler (admitted *pro hac vice*)
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 294-6700
Fax:  (212) 294-4700
Email:  rlawler@winston.com

W. Percy Badham III
Badham & Buck, LLC
2585 Wachovia Tower
420 20th Street North
Birmingham, AL 35203
Telephone:  (205) 521-0036
Fax:  (205) 521-0037
Email:  pbadham@badhambuck.com

*Attorneys for Mr. Douglas W. MacFaddin*

NY:1271771.9