FILED
2010 Jan-19  PM 06:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
Southern Division

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 2:09-cv-02238-AKK |
| | : | |
| CHARLES E. LeCROY and DOUGLAS W. MacFADDIN | : | |
| | : | |
| Defendants. | : | |

_____

**MOTION OF CHARLES LeCROY TO DISMISS COMPLAINT**
_____

COMES NOW Defendant Charles LeCroy and respectfully moves this Court to dismiss the complaint of the U.S. Securities and Exchange Commission ("SEC") for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In support of his Motion, Mr. LeCroy submits the following.

**Oral Argument Respectfully Requested**

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION............................................................................................1

SUMMARY OF THE COMPLAINT AND THE MOTION TO DISMISS.............2

LEGAL STANDARDS FOR REVIEWING A MOTION TO DISMISS UNDER
RULE 12(b)(6) ...............................................................................................4

ARGUMENT..................................................................................................6

I.    The SEC Lacks Jurisdiction Over The Swap Agreements. (Rule 12(b)(1)
      Motion To Dismiss, Counts One Through Three)........................................6

      A.    The SIFMA Index Is Not An Index Of Securities, But An Index Of
            Rates...................................................................................................8

      B.    The Mere Simultaneity Of A Bond Issue With A Swap Does Not Give
            The SEC Jurisdiction Over Both Of Them.........................................11

      C.    The SEC's Arguments Are Better Addressed To Congress Than To
            The Courts.........................................................................................13

II.   The SEC's Claims For Injunctive Relief Must Be Dismissed. (Rule 12(b)(6)
      Motion To Dismiss, Counts One Through Five)...........................................14

      A.    The SEC's Claims For Injunctive Relief Are Barred By The Statute
            Of Limitations...................................................................................14

      B.    The SEC Cannot State A Valid Claim For Injunctive Relief In Any
            Event.................................................................................................16

III.  The Complaint Fails To State A Claim For A Violation Of The Antifraud
      Statutes.  (Rule 12(b)(6) Motion To Dismiss, Counts One Through Four)..17

      A.    The Elements of The SEC's Claims...................................................19

      B.    Counts One to Four of the Complaint Do Not Plead Fraud with
            Particularity, in Violation of Rule 9(b)..............................................20

C. Counts One to Three of the Complaint Fail To State A Claim As To The Swaps, Because Swaps Are Not Subject To The Antifraud Statutes......................................................................................23

D. The Complaint Fails to Allege an Actionable Nondisclosure............23

 1. The Complaint Fails To Allege A Nondisclosure Related To The Swaps.........................................................................24

  a. No Fiduciary Relationship, and Hence No Disclosure Obligation, Arose in Connection With The Swaps........24

  b. The Complaint Shows That J.P. Morgan Complied With All Of Its Contractual Disclosure Requirements...........26

 2. The Complaint Fails To Allege A Nondisclosure Related To The Warrants.....................................................................27

E. The Complaint Fails to Allege A Material Nondisclosure.................28

F. The Complaint Fails To Allege Fraud "In The Offer Or Sale," Or "In Connection With The Purchase Or Sale," Of A Security...................31

CONCLUSION........................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*3M Company v. Browner,*
  17 F.3d 1453 (D.C.Cir.1994).............................................................................15

*Aaron v. SEC,*
  446 U.S. 680 (1980)..............................................................................19, 23

*American United Life Ins. Co. v. Martinez,*
  480 F.3d 1043 (11th Cir. 2007).............................................................................4

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009)..............................................................5, 17, 28, 29, 30

*Bell Atlantic Corp. v. Twombly,*
  127 S. Ct. 1955 (2007)..............................................................4, 17, 28, 30

*Chiarella v. United States,*
  445 U.S. 222 (1980)..............................................................................24

*Cordova v. Lehman Bros., Inc.*
  526 F. Supp.2d 1305 (S.D. Fla. 2006) *aff'd in part, vacated in part sub nom*
  *Puterman v. Lehman Bros.,*332 Fed. Appx. 549 (11th Cir. 2009)....................21

*Eagerton v. Valuations, Inc.,*
  698 F.2d 1115 (11th Cir. 1983).............................................................................6

*Federal Communications Commission v. Fox Television Stations, Inc., __ U.S.__,*
  129 S. Ct. 1800 (2009).............................................................................6

*Ganino v. Citizens Utilities Co.,*
  228 F.3d 154 (2d Cir. 2000).............................................................................29

*In re Cascade Int'l Sec. Liti.,*
  840 F. Supp. 1558 (S.D. Fla. 1993).............................................................................5

*In re Andrx Corp. Inc.,*

296 F. Supp.2d 1356 (S.D. Fla. 2003)...............................................................29

*In re J.P. Morgan Chase Sec. Liti.,*
   363 F. Supp.2d 595 (S.D.N.Y. 2005)......................................................22, 29

*In re Mirant Corp. Sec. Liti.,*
   No. 1:02-CV-1467, 2009 WL 48188 (N.D. Ala. Jan. 7, 2009).........................18

*In the Matter of Snell and LeCroy,*
   90 SEC Docket 1536, Admin. Proc. File 3-12359,
   2007 WL 1297008 (S.E.C. May 3, 2007)......................................................6, 11

*La Grasta v. First Union Securities,*
   358 F.3d 840 (11th Cir. 2004)..........................................................................9

*MacDonald v. Alan Bush Brokerage Co.,*
   863 F.2d 809, 814 (11th Cir. 1989)................................................................22

*Mistretta v. United States,*
   488 U.S. 361 (1989)..........................................................................................6

*Proctor & Gamble Co. v. Bankers Trust Co.,*
   925 F. Supp. 1270 (S.D. Ohio 1996)...............................................................10

*Rudolph v. Arthur Andersen & Co.,*
   800 F.2d 1040 (11th Cir. 1986)......................................................................23

*School District of the City of Erie v. J.P. Morgan Chase Bank,*
   No. 08 CV 07688-LAP, 08 CV 07982, 2009 WL 234128
   (S.D.N.Y. Jan. 30, 2009)................................................................10, 11, 25

*SEC v. Cochran,*
   214 F.3d 1261 (10th Cir. 2000).......................................................................20

*SEC v. Fitzgerald,*
   135 F. Supp.2d 992 (N.D. Cal. 2001)..............................................................20

*SEC v. Ginsburg,*
   362 F.3d 1292 (11th Cir. 2004).................................................................20, 21

*SEC v. Jones,*
  476 F. Supp.2d 374 (S.D.N.Y. 2007)...............................................................15

*SEC v. Langford, et al.,*
  No. 08-cv-0761 (N.D. Ala. filed Apr. 30, 2008)....................................8

*SEC v. Leslie,*
  No. C 07-3444 JF, 2008 WL 4183939
  (N.D. Cal. Sept. 9, 2008)........................................................................15

*SEC v. Merchant Capital, LLC,*
  483 F.3d 747 (11th Cir. 2007)...............................................................19

*SEC v. Mutual Benefits Corp.,*
  408 F.3d 737 (11th Cir. 2005)...................................................................8

*SEC v. Physicians Guardian Unit Inv. Trust,*
  72 F. Supp.2d 1342 (M.D. Fla. 1999).............................................5, 20

*SEC v. Roanoke Tech. Corp.,*
  No. 6:05-cv-1880, 2006 WL 3813755 (M.D. Fla. Dec. 26, 2006)..............21, 31

*SEC v. Scrushy,*
  No. CV-03-J-615S, 2005 WL 3279894 (N.D. Ala. Nov. 19, 2005).......15, 21-22

*SEC v. Solow,*
  No. 06-81041 CIV, 2007 WL 1970806 (S.D. Fla. May 10, 2007)...................19

*St. Matthews's Baptist Church v. Wachovia Bank Nat'l Ass'n,*
  No. Civ.A. 04-4540, 2005 WL 1199045 (D.N.J. May 18, 2005)............9, 10, 25

*Tellabs v. Makor Issues & Rights, Ltd., ___ U.S. ___,*
  127 S. Ct. 2499 (2007)......................................................................12, 20

*United States v. Langford*
  No. 08-cr-00245-LSC-PWG-1, (N.D. Ala. filed June 12, 2008).......................8

*White v. Mercury Marine, Division of Brunswick, Inc.,*
  129 F.3d 1428 (11th Cir.1997)...............................................................10

*Ziemba v. Cascade Int'l, Inc.,*
    256 F.3d 1194 (11th Cir. 2001)...................................................5, 6, 19, 20, 24

**STATUTES AND REGULATIONS**

15 U.S.C. § 77q(a)...........................................................................................7, 13

15 U.S.C. § 77q(a)(1).............................................................................................3

15 U.S.C. § 77q(a)(2).............................................................................................3

15 U.S.C. § 77q(a)(3).............................................................................................3

15 U.S.C. § 77t(b)................................................................................................16

15 U.S.C. § 78j(b)........................................................................................3, 7, 13

15 U.S.C. § 78o-4(c)(1).........................................................................................3

15 U.S.C. § 78u(d)(1)..........................................................................................16

28 U.S.C. § 2462.................................................................................................15

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
    § 302(a), 114 Stat. 2763, 2763A-451.................................................................7

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
    § 302(b), 303(d), 114 Stat. 2763, 2763A-452-54.........................................7, 13

Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554
    § 303(a), 114 Stat. 2763, 2763A-452.................................................................7

Gramm-Leach-Bliley Act, Pub. Law 106-554 §206B, 114 Stat. 2763,
    2763A-451 (2000)............................................................................................7

Over-the-Counter Derivatives Markets Act of 2009, H.R. 3795 (reported by
    committee October 15, 2009).............................................................................13

Exchange Act § 10(b)...............................................................................3, 7, 13, 19

Exchange Act § 15B(c)(1)...................................................................................3

Securities Act § 17(a)...............................................................................passim

Securities Act § 17(a)(1)...................................................................................3, 19

Securities Act § 17(a)(2)...............................................................................3, 19, 23

Securities Act § 17(a)(3)...............................................................................3, 19, 23

17 C.F.R. § 240.10b-5.................................................................................passim

17 C.F.R. § 240.15c2-12....................................................................................27

FED. R. CIV. P. 9(b)..................................................................................passim

FED. R. CIV. P. 12(b)(1)...................................................................4, 6, 8, 32

FED. R. CIV. P. 12(b)(6).................................................................................passim

FED. R. EVID. 201.................................................................................9, 15

Municipal Securities Rulemaking Board Rule G-17............................................3, 19

Municipal Securities Rulemaking Board Rule G-20..................................................3

Municipal Securities Rulemaking Board Rule G-32................................................28

## OTHER AUTHORITIES

SEC Release No. 33-7049, 34-33741 (March 9, 1994):  Interpretive Guidance
    on the Antifraud Provisions; available at
    content.lawyerlinks.com/library/sec/sec_releases/33-7049.htm.......................28

Order Granting Partial Summary Disposition to the SEC of Enforcement, Admin.
    Proc. 3-12359, Rulings Release No. 630 (October 18, 2006)...........................15

## INTRODUCTION

The Securities and Exchange Commission's ("SEC") Complaint is long on innuendo but falls short on the strict standards that govern its jurisdiction and causes of action.  Whatever the merits of the conduct that the SEC attacks – be it unsavory, or bad policy; or permissible, even proper; or elsewhere on the spectrum of possibilities – it is not securities fraud unless the Complaint meets those strict standards.

This Complaint does not.  The SEC lacks jurisdiction over three of the six transactions alleged; its claim for injunctive relief is both time-barred and legally insufficient; and as to all claims, the SEC has failed to allege the elements of its various securities fraud theories.

## SUMMARY OF THE COMPLAINT AND THE MOTION TO DISMISS

The SEC seeks relief in connection with six transactions.  Three are warrant offerings on which J.P. Morgan was an underwriter:

- the "2002-C Warrants," an $839 million sewer revenue warrant offering that closed October 24, 2002 (Complaint ¶ 13);

- the "2003-B Warrants," a $1.1 billion sewer revenue warrant offering that closed May 1, 2003 (id.);

- the "2003-C Warrants," a $1.05 billion sewer revenue warrant offering that closed August 7, 2003 (id.);

and three are "interest rate swaps"[1] on which J.P. Morgan was the counterparty to Jefferson County:

- the "2003-B swap," a $1.1 billion swap agreement executed on March 28, 2003 (Complaint ¶ 14);

- the "2003-C swap," a $789 million swap agreement executed on July 14, 2003 (id.); and

---

[1]  An "interest rate swap" like those at issue is "a contractual arrangement that sets a maximum interest rate that a borrower is required to pay on a loan. The parties to the [a]greement agree to exchange interest payments on specific dates on a defined principal amount for a fixed period of time, according to a predetermined formula.  The principal amount, which is never exchanged, is referred to as the 'notional' amount.  If the floating rate drops below the fixed rate, the borrower owes the difference between the floating rate and the fixed rate, multiplied by the notional amount, to the bank.  If the floating rate exceeds the fixed rate, however, the borrower receives the benefit of the fixed rate."  St. Matthews's Baptist Church v. Wachovia Bank Nat'l Ass'n, No. Civ.A. 04-4540, 2005 WL 1199045, at *13 n.8 (D.N.J. May 18, 2005).

- the "November 2003 swap," a $111 million swap agreement executed on November 7, 2003.

Each of the swap agreements used, at least "in part" (Complaint ¶ 18), the Municipal Swap Index ("MSI") compiled by the Securities Industry and Financial Markets Association ("SIFMA")[2] to define one counterparty's payment obligation. Complaint ¶¶18-19.

The Complaint sets forth five claims:

- Count One: violation of Securities Act § 17(a)(1), 15 U.S.C. § 77q(a)(1) (Complaint ¶¶ 94-96);

- Count Two: violation of Securities Act §§ 17(a)(2) and 17(a)(3), 15 U.S.C. §§ 77q(a)(2), (3) (Complaint ¶¶ 97-99);

- Count Three: violation of Exchange Act § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (Complaint ¶¶ 100-102);

- Count Four: violation of Exchange Act § 15B(c)(1), 15 U.S.C. § 78o-4(c)(1), and MSRB Rule G-17 (Complaint ¶¶ 103-109); and

- Count Five: violation of Exchange Act § 15B(c)(1), 15 U.S.C. § 78o-4(c)(1), and MSRB Rule G-20 (Complaint ¶¶ 110-116).

In sum, the Complaint alleges fraud in the failure to disclose payments that J.P. Morgan[3] made to local broker-dealers affiliated with "close friends of the

---

[2]    SIFMA was formerly known as the Bond Market Association.  The Complaint refers to the Bond Market Association's Municipal Swap Index, which is the same index.  E.g., Complaint ¶ 19.

[3]    For ease of reference, this Memorandum will use "J.P. Morgan" to refer both to J.P. Morgan Securities, Inc., which served as bond underwriter; and J.P. Morgan Chase Bank, N.A., the swap provider.

[Jefferson County] commissioners," allegedly for the purpose of ensuring that J.P. Morgan received County bond and swap work.  Complaint ¶ 2-3.

Mr. LeCroy moves to dismiss the Complaint in the following particulars:

1.  Under Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction over the swaps (Counts One-Three[4]);

2.  under Rule 12(b)(6), to dismiss the claims for injunctive relief because (a) the limitations period has expired, and (b) the Complaint fails to allege a valid claim for injunctive relief (Counts One-Five); and

3.  under Rule 12(b)(6), for failure to allege a violation of the antifraud statutes and Municipal Securities Rulemaking Board ("MSRB") Rules (Counts One-Four).

## LEGAL STANDARDS FOR REVIEWING A MOTION TO DISMISS UNDER RULE 12(b)(6)

The Supreme Court in recent years has imposed a more rigorous standard of review under Federal Rule of Civil Procedure 12(b)(6).  The court considering a Rule 12(b)(6) motion still accepts all of the plaintiff's well-pleaded facts as true; American United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007); but it will not accept as true a legal conclusion couched as a factual allegation. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007).   "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more

---

[4]   Counts Four and Five allege conduct in connection with securities offerings only.

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."  Id.

Even "well-pleaded facts" are not enough to save a complaint under this standard, when they create no more than a "suspicion of a legally cognizable right of action."  Id.  The Complaint must "show," and not merely "allege," that the plaintiff is entitled to relief.  As elucidated most recently in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009):

> Only a complaint that states a plausible basis for relief survives a motion to dismiss.  . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "shown" – "that the pleader is entitled to relief."

Id. at 1950 (citations omitted).

When a complaint sounds in fraud, the pleader also must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001); SEC v. Physicians Guardian Unit Inv. Trust, 72 F. Supp.2d 1342 (M.D. Fla. 1999) (applying Rule 9(b) to enforcement action by SEC under Sections 17(a) and 10(b)).  Rule 9(b) requires that the complaint allege:

> (1)    Precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the

> content of such statements and the manner in which they
> misled the plaintiff, and (4) what the defendants obtained
> as a consequence of the fraud.

Ziemba, 256 F.3d at 1202.

For the reasons explained below, this Complaint does not meet these standards.

## ARGUMENT

### I. The SEC Lacks Jurisdiction Over The Swap Agreements. (Rule 12(b)(1) Motion To Dismiss, Counts One Through Three)

The SEC bears the burden of establishing its jurisdiction over the transactions as to which it claims fraud. Eagerton v. Valuations, Inc., 698 F.2d 1115, 1118 (11th Cir. 1983); In the Matter of Snell and LeCroy, No. 3-12359, 2007 WL 1297008 at *41 (S.E.C. May 3, 2007). Congress, of course, defines the SEC's jurisdiction as it does that of all Article I agencies. "The Constitution requires that Congress' delegation of lawmaking power to an agency must be specific and detailed . . . and specify the boundaries of [the] delegated authority." Federal Communications Commission v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1823 (2009) (citing Mistretta v. United States, 488 U.S. 361, 372-374 (1989)) (internal quotations omitted). When Congress makes a specific grant of jurisdiction, neither the courts nor the agency can broaden it without offending the separation of powers. See id.

In general, the SEC lacks jurisdiction over derivative transactions, including swaps.  In 2000, however, Congress in the Commodity Futures Modernization Act of 2000 ("CFMA") slightly broadened the SEC's antifraud jurisdiction to encompass a particular kind of swap:  a "security-based swap."[5]  CFMA, Pub. Law No. 106-554 §§ 302(b), 303(d), 114 Stat. 2763, 2763A-452-54; codified at 15 U.S.C. § 77q(a) (Securities Act § 17(a)), 15 U.S.C. § 78j(b) (Exchange Act § 10(b)).  Congress defined a "security-based swap agreement" as an agreement

> of which a material term is based on the price, yield, value or volatility of any security or group or index of securities, or any interest thereon.

Gramm-Leach-Bliley Act, Pub. Law 106-554 §206B, 114 Stat. 2763, 2763A-451 (2000).

Bearing that definition in mind, the SEC consistently calls the swaps at issue in this case "security-based swaps."  It contends that the SIFMA index is an "index of securities," on the "value" of which a "material term" of the swap agreements is based.  E.g., Complaint ¶ 19.  But the undisputed facts show that the SIFMA index is not an index of securities, and that no material term of the agreements is based

---

[5]     CFMA clarified that the SEC completely lacks regulatory, as opposed to antifraud, jurisdiction over any type of swap.  CFMA Pub. Law No. 106-554 § 302(a), 114 Stat. 2763, 2763A-451; Pub. Law No. 106-554 § 303(a), 114 Stat. 2763, 2763A-452.  Nor did CFMA expand the SEC's authority under Section 15B, through which it enforces MSRB rules.  Thus, alleged violations of MSRB rules apply only to securities transactions, not to swaps of any type.

on its value.  The SEC's alternative argument, that it has jurisdiction over all swaps executed close in time to the issuance of securities, is equally unavailing. Accordingly, Mr. LeCroy moves to dismiss the Complaint under Fed. R. Civ. Pro 12(b)(1) for lack of subject matter jurisdiction.[6]

### A. The SIFMA Index Is Not An Index Of Securities, But An Index Of Rates.

No less an authority than SIFMA itself (formerly the Bond Market Association) has explained in this Court that its index is not an index of securities. SIFMA filed an *amicus* brief and reply in <u>SEC v. Langford</u>, <u>et al.</u>, Civil No. 08-B-0761-S (N.D. Ala.), in which the SEC claimed jurisdiction over the very same swap agreements at issue in this case (plus one more).[7]  In its briefing, attached hereto as Exhibits "A" and "B," SIFMA explained that its index compiles the interest rates on variable rate demand notes ("VRDNs").  SIFMA Opening Brief as Amicus Curiae (without exhibits), attached hereto as Exhibit "A," at 23-25.  It does not compile the underlying VRDNs' "price, yield, value, or volatility."  <u>Id.</u>  Indeed, the Jefferson County swap agreements utilized the SIFMA index to establish a

---

[6]     Because this is a facial attack upon the Complaint in which the facts are either undisputed or subject to judicial notice, the Court may, and should, resolve this jurisdictional challenge at the motion to dismiss stage.  <u>See, e.g.</u>, <u>SEC v. Mutual Benefits Corp.</u>, 408 F.3d 737, 742 (11th Cir. 2005).

[7]     The <u>Langford</u> civil case was stayed pending resolution of the criminal case, <u>United States v. Langford</u>, No. 08-cr-00245-LSC-PWG-1 (N.D. Ala., filed June 12, 2008), and currently remains stayed.

benchmark *interest rate*, not a benchmark *value* – as the Complaint reflects.[8] Complaint ¶¶ 18 and 19.  The use of the SIFMA index in practice corroborates SIFMA's characterization of it.

This Court should take judicial notice of SIFMA's explanation.  SIFMA created the index in 1991 and has maintained it since.  SIFMA Opening Brief as *Amicus Curiae*, Exhibit "A," at 8.  In resolving the identical jurisdictional issue in a case involving swaps based on a different index, the LIBOR, the District of New Jersey took judicial notice of the characterization of the LIBOR proffered by the group that compiles it.  As that court noted, Federal Rule of Evidence 201 permits judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  St. Matthews's Baptist Church v. Wachovia Bank Nat'l Ass'n, 2005 WL 1199045 at *13 n.8 (D.N.J. May 18, 2005); see also La Grasta v. First Union Securities, 358 F.3d 840, 842 (11th Cir. 2004)(taking judicial notice of price of stock on certain days).  The district court in St. Matthews recognized that the group that compiles an index is the most authoritative source of information about what that index *is*.

---

[8]   In fact the March 2003 and July 2003 agreements used the LIBOR in exactly the same way, to define the counter-rate.  See, e.g., March 28, 2003 Swap Confirmation, attached hereto as Exhibit "C."  The LIBOR is not an "index of securities" either; and the SEC lacks jurisdiction over LIBOR-based swaps.  St. Matthews's, 2005 WL 1199045 at *13.

This Court likewise should judicially notice SIFMA's characterization of the index that it compiles, as a "source whose accuracy cannot reasonably be questioned."

The district court in St. Matthew's also recognized, quite properly, that the LIBOR is an index of interest rates, not an index of securities. Therefore, LIBOR-based swaps are not "security-based swaps," and the SEC lacks jurisdiction over them. St. Matthew's, 2005 WL 1199045 at *12; accord School District of the City of Erie v. J.P. Morgan Chase Bank, No. 08 CV 07688-LAP, 2009 WL 234128 (S.D.N.Y. Jan. 30, 2009). SIFMA is the "tax-exempt market equivalent of LIBOR." SIFMA Opening Brief as Amicus Curiae, Exhibit "A," at 8. Accordingly, the SEC also lacks jurisdiction over SIFMA-based swaps.

The history of the Commodity Futures Modernization Act shows that Congress quite deliberately chose to grant the SEC only limited additional jurisdiction. Case law predating the CFMA held that the securities laws do not cover interest rate swaps at all. See, e.g., Proctor & Gamble Co. v. Bankers Trust Co., 925 F. Supp. 1270 (S.D. Ohio 1996). Courts presume that "Congress acts with knowledge of existing law and it expects its statues to be read in conformity with [established] precedents." White v. Mercury Marine, Division of Brunswick, Inc., 129 F.3d 1428, 1434-35 (11th Cir.1997) (internal citations omitted). Had Congress intended to grant the SEC sweeping authority over all swaps, surely it would have done so. Instead, it narrowly granted the SEC one type of authority

over *one* type of swap.  Because the SIFMA index is an index of interest rates, not of securities, swaps based upon it fall outside Congress's grant of authority to the SEC.

### B. The Mere Simultaneity Of A Bond Issue With A Swap Does Not Give The SEC Jurisdiction Over Both Of Them.

Pursuing again an issue that it lost in an earlier run at Mr. LeCroy, the SEC makes the discredited argument that any time that an issuer simultaneously issues bonds and enters into a swap agreement, the SEC has jurisdiction over both transactions.[9]  The Commission's own Administrative Law Judge ("ALJ") rejected that attempt at bootstrapping in In the Matter of Snell and LeCroy, 2007 WL 1297008 (S.E.C. May 3, 2007), a ruling that the full Commission later confirmed. The ALJ said plainly that "the contemporaneous nature of the two transactions does not make them a single financial instrument with a bond component." Id. at *32-33.  The Southern District of New York later endorsed that "common sense approach" in School District of the City of Erie, 2009 WL 234128 (also adopting the holding of St. Matthews's Baptist Church, supra, that the LIBOR is not an index of securities).

---

[9]   This argument applies only to the 2003-B and 2003-C swaps, because only they were executed near in time to a bond issue.  The SEC does not contend that the November 2003 swap had a corresponding bond deal.

Here, the SEC cites a presentation that the County made to a rating agency, in which it identifies the 2003-B bond issue and swap agreement as one "finance plan" with two components.  Complaint ¶ 51; see March 12, 2003 Presentation Regarding the Sewer Operation Fund to Standard & Poor's, attached hereto as Exhibit "D."[10]  That citation lends no substance at all to the SEC's claims.  First, the Court may note that the phrase "finance plan" is merely a section title in a PowerPoint presentation; it hardly constitutes a statement of the SEC's jurisdiction.  See March 12, 2003 Presentation, Exhibit "D," at 22-23.  Second and perhaps more importantly, a market participant's view of the relationship between distinct transactions has no bearing on the SEC's jurisdiction.   Whether multiple transactions were or were not part of an issuer's single "plan" is irrelevant.  Equally irrelevant is phraseology in the underwriter's 2003-B and 2003-C official statements, and the County Commission's 2003-C resolution, mentioning that the County entered into swap agreements "in connection with" the bond issues.  See Complaint ¶¶ 51, 73, 74.  Only Congress may define the SEC's jurisdiction.  Market participants cannot expand or contract it through their subjective characterization of the relationship between transactions.   To the contrary,

---

[10]    The Court "must" review in connection with a 12(b) motion any document referenced by the Complaint, as well as any matters of which it may take judicial notice.  That review does not convert the 12(b) motion into a motion for summary judgment.  Tellabs v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007).

Congress carefully defined the SEC's jurisdiction based on the nature of *individual* transactions (e.g., whether a particular swap agreement is "security-based"), not the temporal or other relationship between them. CFMA, Pub. Law No. 106-554 §§ 302(b), 303(d), 114 Stat. 2763, 2763A-452-54; codified at 15 U.S.C. § 77q(a) (Securities Act § 17(a)), 15 U.S.C. § 78j(b) (Exchange Act § 10(b)). The "facts" that the SEC cites are nothing more than inoperative phraseology that sheds no light on the nature of the individual transactions. The temporal relationship between the transactions is likewise unavailing. Nothing in the Complaint shores up the SEC's deficient claim to jurisdiction.

Moreover, the facts that the SEC alleges actually illustrate that the 2003-B and 2003-C bond and swap deals were four separate transactions with four separate closings. See, e.g., Complaint ¶¶ 50, 73. The factual allegations do not bolster the SEC's deficient claim to jurisdiction; they actually undercut it.

### C. The SEC's Arguments Are Better Addressed To Congress Than To The Courts.

It is no secret that given the current financial crisis, the SEC has been advocating to expand its jurisdiction to encompass all types of derivatives, including swaps. See, e.g., Over-the-Counter Derivatives Markets Act of 2009, H.R. 3795 (reported by committee October 15, 2009). The legislative process is the proper place for the SEC to pursue that expansion. The litigation process is

not.  Much less is it proper for the SEC to use the litigation process to expand its own jurisdiction retroactively, to transactions that took place in 2002 and 2003. The SEC's antifraud jurisdiction is limited by statute to securities and security-based swap agreements, as specifically defined.  It cannot sweep in other transactions by appending them, temporally or otherwise, to transactions that it does have the power regulate.  The courts may effectuate only a "specific and detailed" grant of Congressional authority to an agency, and the Congressional grant at issue does not reach as far as the SEC would like.  See Fox Television 129 S. Ct. at 1823.  The SEC should seek its remedy in Congress, not the courts.

**II.**     **The SEC's Claims For Injunctive Relief Must Be Dismissed.** (Rule 12(b)(6) Motion To Dismiss, Counts One Through Five)

### A. The SEC's Claims For Injunctive Relief Are Barred By The Statute Of Limitations.

The Complaint also must be dismissed to the extent that the SEC seeks injunctive relief against Mr. LeCroy.  As applied to a person who was barred from the industry years ago - as Mr. LeCroy was - an injunction serves no public interest but is merely a penalty, and thus is barred by the applicable five-year statute of limitations.

A five-year limitations period applies to all civil penalty actions by the federal government, unless Congress specifically provides otherwise.  SEC v.

14

Scrushy, No. CV-03-J-615S, 2005 WL 3279894 (N.D. Ala. Nov. 19, 2005) (citing 3M Company v. Browner, 17 F.3d 1453, 1461 (D.C. Cir.1994)); 28 U.S.C. § 2462.[11]   The five-year limitations period does not apply, however, to equitable relief aimed at protecting the public.   See id.   Therefore, courts must scrutinize SEC claims for injunctive relief to determine whether an injunction would serve the public interest or merely punish the defendant.   To answer that question, "the Court looks to the likelihood of recurrence of violations and the possible collateral consequences of issuing an injunction."   SEC v. Jones, 476 F. Supp.2d 374, 380-81 (S.D.N.Y. 2007); see also SEC v. Leslie, No. C 07-3444 JF, 2008 WL 4183939, *3 (N.D. Cal. Sept. 9, 2008).   An injunction that is not based on a realistic likelihood of a future violation is punitive.   Jones, 476 F. Supp.2d at 384-85.

There is literally no possibility of Mr. LeCroy violating the securities laws in the future:  he was barred from the industry in 2006.   See Order Granting Partial Summary Disposition to the SEC of Enforcement, Admin. Proc. 3-12359, Rulings Release No. 630 (October 18, 2006), attached hereto as Exhibit "E."[12]   Plainly the

---

[11]   Section 2462 states: "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."  28 U.S.C. § 2462.

[12]   The Court may take judicial notice of the bar because it is a public document.   See Federal Rule of Evidence 201.   Typically a court will permit factual development before ruling on a statute of limitations issue.   In this case,

SEC has not brought this suit to protect the public interest.   The SEC first questioned Mr. LeCroy in **2004** about his and J.P. Morgan's dealings in Jefferson County.   The agency presumably would have filed suit prior to November 2009 were the suit necessary to protect the public.   Whatever motivated this filing more than five years later, it is not a prospective need to prevent a violation.

The Complaint alleges no actions by Mr. LeCroy after 2003.   Because the injunctive relief that the SEC seeks is not equitable, but punitive, the SEC's claims are time-barred.

## B. The SEC Cannot State A Valid Claim For Injunctive Relief In Any Event.

For essentially the same reasons, the SEC cannot state a valid claim for injunctive relief even had it attempted to do so timely.   The SEC is authorized to seek an injunction only against a person who is "engaged [in] or is about to engage in any acts or practices constituting a violation."   15 U.S.C. § 78u(d)(1); <u>see also</u> 15 U.S.C. § 77t(b) (SEC entitled to injunction only "upon a proper showing" that "any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation.").   The SEC's conclusory allegation that "unless the Court enjoins [the defendants], they are reasonably likely to continue to violate the

---

however, the Court's ability to note the existence of the bar obviates further factual development on this topic, and enables the Court to rule at the motion to dismiss stage.

federal securities laws" cannot survive the <u>Twombly</u> standard.   Complaint ¶ 7; <u>accord</u> Complaint ¶¶ 96, 99, 102, 109, 116; <u>see</u> discussion of <u>Twombly</u> <u>supra</u>.  The SEC alleges no facts except for those long in the past, which cannot support its claim that Mr. LeCroy will violate the law in the future.[13]   The fact that Mr. LeCroy was barred from the industry in 2006 – as the Court may judicially notice – padlocks this closed door.   The SEC's claims for injunctive relief must be dismissed for failure to state a claim.

**III.   The Complaint Fails To State A Claim For A Violation Of The Antifraud Statutes.**   (Rule 12(b)(6) Motion To Dismiss, Counts One Through Four)

As explained above, pleading the bare elements of a claim does not overcome a motion to dismiss after <u>Twombly</u> and <u>Iqbal</u>.  The SEC must plead the "grounds" that "show," and not merely "allege," a "plausible" claim for relief. <u>Iqbal</u>, 129 S. Ct. 1950.  Moreover, when a complaint sounds in fraud, it must meet the specificity standard of Federal Rule of Civil Procedure 9(b).   <u>See</u> discussion <u>supra</u>, Legal Standards For Reviewing A Motion To Dismiss.  This Complaint is deficient in several respects.

---

[13]     The SEC alleges no facts even suggesting that Mr. LeCroy violated securities laws after he was barred from the industry in 2006.  When the SEC is able – as it is unable here – to allege that a prior bar was ineffective, it may have a basis for claiming that further injunctive relief is necessary to prevent another violation.  It has no such basis in this case.

Innuendo does not cure those deficiencies.  As another Judge of this Court recently recognized, accusations of nefarious conduct do not necessarily state a claim for securities fraud.  In a passage that could almost have been written for this Complaint, Judge Story stated:

> There is no shortage in the Complaint of descriptions of nefarious sounding [conduct] that raise a specter of impropriety. . . . But with the Complaint's abundance of adjectives and labels, it lacks an explanation and legal basis.  The blanket characterization of business transactions as illegal does not make them so, nor does alleging their nondisclosure necessarily state a valid Securities Act or Exchange Act violation.  To do so, Plaintiffs must allege with particularity the reason why Defendants were under a duty to disclose a particular transaction.

In re Mirant Corp. Sec. Liti., No. 1:02-CV-1467, 2009 WL 48188 at *18 (N.D. Ala. Jan. 7, 2009).  Judge Story dismissed that complaint because it never moved beyond the "specter of impropriety" to the elements of a securities fraud violation. Id.  Nor does this one.

In this case, the SEC does not allege that the fee payments themselves were illegal – at least, the Complaint does not so state.  The SEC contents itself with inflammatory references and selective quotations that raise "the specter of impropriety," without grounding the insinuations in a legal theory.  See id. at *18. That approach runs afoul of the Eleventh Circuit's caution that a fraud complaint must comply with Rule 9(b) in order to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious

18

charges of immoral or fraudulent behavior." Ziemba v. Cascade Int'l, Inc., 256
F.3d 1194, 1202 (11th Cir. 2001) (internal quotations omitted).   Because the
Complaint fails in all of the particulars explained below, it must be dismissed.

### A. The Elements of The SEC's Claims

The SEC's antifraud claims have many elements in common:

"A violation occurs under Section 17(a)(1) of the Securities Act, Section
10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder when
there is

(1) a misrepresentation or omission,

(2) that was material,

(3) which was made in the offer and sale of a security [Section
17(a)(1)], or in connection with the purchase or sale of
securities [Section 10(b) and Rule 10b-5],

(4) scienter, and

(5) the involvement of interstate commerce, the mails, or a
national securities exchange."

SEC v. Solow, 2007 WL 1970806, at *2 (S.D. Fla. May 10, 2007) (formatting
inserted for ease of reference).   Sections 17(a)(2) and (3) have the same elements,
except that negligence substitutes for scienter.   Aaron v. SEC, 446 U.S. 680, 697
(1980); SEC v. Merchant Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007).   The
elements required to establish a violation of MSRB Rule G-17 are "not appreciably
distinct" from those required to establish a violation of section 17(a).   SEC v.

Fitzgerald, 135 F. Supp.2d 992, 1027 n.11 (N.D. Calif. 2001) (citing SEC v. Cochran, 214 F.3d 1261, 1264 n.2 (10th Cir. 2000)).

**B. Counts One to Four of the Complaint Do Not Plead Fraud with Particularity, in Violation of Rule 9(b).**

As explained above, a complaint that sounds in fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Ziemba, 256 F.3d at 1202; SEC v. Physicians Guardian Unit Inv. Trust, 72 F. Supp.2d 1342 (M.D. Fla. 1999) (applying Rule 9(b) to enforcement action by SEC under Sections 17(a) and 10(b)).  Rule 9(b) requires that the complaint allege:

> (1)   Precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.[14]

Ziemba, 256 F.3d at 1202.  A fraud complaint also must give rise to a "strong inference of scienter" – an inference that is "more than merely 'reasonable' or 'permissible'- it must be cogent and compelling, thus strong in light of other explanations."   Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007); see SEC v. Ginsburg, 362 F.3d 1292 (11th Cir. 2004) (applying "strong

---

[14]      The Complaint contains no allegations of personal benefit to the Defendants.

inference" standard to SEC enforcement action); <u>SEC v. Roanoke Tech. Corp.</u>, No. 6:05-cv-1880, 2006 WL 3813755 (M.D. Fla. Dec. 26, 2006) (same).

Significantly for this case, these detailed 9(b) allegations must be particularized to the individual defendant. Alleging that a document omits a required disclosure, without attributing the omission to the defendant, does not satisfy Rule 9(b). <u>Cordova v. Lehman Bros., Inc.</u>, 526 F. Supp.2d 1305, 1313 (S.D. Fla. 2006) (allegations that "marketing materials or documents made the representations . . . obscure[] who was responsible for a given representation."); <u>aff'd in part</u>, <u>vacated in part sub nom</u>. <u>Puterman v. Lehman Bros.</u>, 332 Fed. Appx. 549 (11th Cir. 2009). The Complaint is replete with examples of such generalized allegations of corporate nondisclosure. <u>See</u>, <u>e.g.</u>, Complaint ¶ 40 ("JP Morgan Securities transmitted the official statement to investors"); ¶ 57 ("JP Morgan created and finalized the swap agreement confirmation"). Pleading corporate liability is unfair to individual defendants, whose disclosure obligations – and whose liability -- vary with their particularized knowledge and roles. <u>Roanoke Tech.</u>, 2006 WL 3813755 at *5. Even though the SEC may at one time have contemplated filing the Complaint against a corporate defendant in addition to the individual Defendants, these generalized allegations no longer suffice. <u>Scrushy</u>, 2005 WL 3279894 at *1 ("HealthSouth Corporation is no longer a party to this litigation. Therefore, all references to HealthSouth Corporation, where there is no

21

specific allegation that defendant Scrushy was acting on behalf of and for said corporation, are improper."). The individualized pleading requirement applies *a fortiori* to scienter and negligence, which are inherently individual.   See, e.g., In re JP Morgan Chase Securities Liti., 363 F. Supp.2d 595, 627-28 (S.D.N.Y. 2005) (dismissing claim against individual defendant for failure to plead knowledge of falsity/scienter, while permitting claim to go forward against corporate defendant). The scienter question turns on the defendant's mental state with respect to the alleged nondisclosures, not with respect to the underlying payments, which the SEC does not identify as a separate basis for liability.   Thus, the question is not whether the defendant knew the "true purpose" and other facts about the payments, Complaint ¶ 3-4, but whether he acted with scienter when omitting to disclose them.

> The Eleventh Circuit defines scienter as "severe recklessness," limited to
>
> those highly unreasonable omissions or misrepresentations that involve not merely simple or inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

MacDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).  As explained below, the Complaint itself shows that no disclosure obligations applied to the fee payments.  See discussion infra Section III.D.  It contains no allegations – literally none – even suggesting that Mr. LeCroy had reason to believe that the

law prohibited the omissions about which the SEC complains.  Much less does the Complaint raise a "strong inference" that he was "severely reckless" in ignoring his (nonexistent) disclosure obligations.  In the absence of an allegation that a reasonable person would know that the law required disclosure of all fee payments, the Complaint does not even suggest that Mr. LeCroy was negligent in failing to disclose.  See Aaron, 446 U.S. at 697 (negligence substitutes for scienter in Section 17(a)(2) and (3) claims).

## C. Counts One to Three of the Complaint Fail To State A Claim As To The Swaps, Because Swaps Are Not Subject To The Antifraud Statutes.

Counts One to Three of the Complaint, predicated on Section 17(a) and Section 10(b), will require the SEC to prove that fraud occurred "in the offer and sale of a security," or "in connection with the purchase or sale of securities." Plainly, these Counts fail to state a claim as to the swaps, which are not "securities."  See discussion supra, Section I.  Thus, Counts One to Three must be dismissed to the extent that they allege violations in connection with the swaps.

## D. The Complaint Fails to Allege an Actionable Nondisclosure.

The Complaint does not allege affirmative misrepresentations; it alleges omissions.  Yet the law imposes no generalized duty to disclose material information.  Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir. 1986) (failing to disclose a material fact is "proscribed only when [there is] a duty

23

to disclose").  Although silence "may operate as an [actionable] fraud . . . such liability is premised on a duty to disclose . . . arising from a relationship of trust and confidence between parties to a transaction."  Chiarella v. United States, 445 U.S. 222, 230 (1980).  Parties that are not fiduciaries owe no disclosure obligations to each other.  In re Cascade Int'l Sec. Liti., 840 F. Supp. 1558, 1564 (S.D. Fla. 1993), aff'd sub nom. Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194 (11th Cir. 2001)).

Because the Complaint alleges no facts giving rise to a disclosure duty, the alleged omissions are not actionable.

### 1. The Complaint Fails To Allege A Nondisclosure Related To The Swaps.

#### a. No Fiduciary Relationship, and Hence No Disclosure Obligation, Arose in Connection With The Swaps.

No SEC regulation imposes a disclosure obligation with respect to swaps – because the SEC cannot regulate swaps.  See discussion of CFMA, supra note 5 and accompanying text.  Thus, if any disclosure obligation applies to swaps at all, it must arise out of a fiduciary relationship.  See Chiarella, 445 U.S. at 230.  But in the transactions at issue, Jefferson County and J.P. Morgan expressly disclaimed any fiduciary relationship; they were "counterparties," sitting opposite each other at the negotiating table.  The "Master Agreement" produced by the International Swaps and Derivatives Association ("ISDA Master Agreement"), which governed

these transactions, expressly states that neither party was "acting as a fiduciary for or an advisor to" the other. ISDA Master Agreement, U.S. Municipal Counterparty Schedule to the Master Agreement, at 11; attached hereto as Exhibit "F." In both the ISDA Master Agreement and the Confirmations applicable to each swap, the County represented that:

> (1) it is "acting for its own account and [] has made its own independent decision to enter into that Swap Transaction and as to whether that Swap Transaction is appropriate for it based upon its own judgment and upon advice from advisors as it has deemed necessary"; and

> (2) J.P. Morgan "is not acting as a fiduciary for or an advisor to [the County] in respect of that Swap Transaction."

ISDA Master Agreement, Exhibit "F," at 11; e.g., Confirmation of the March 2003 Swap, attached hereto as Exhibit "C," at §6(a), (c). A swap is a contract between private parties, and the parties assume only the obligations set forth in the contract. See St. Matthew's, 2005 WL 1199045 at *1. Recognizing that, the Southern District of New York held that these very provisions precluded finding a duty to disclose, because the parties were not fiduciaries. School District of Erie, 2009 WL 234128 at *3. That court dismissed a complaint that alleged omissions, as this Court should do here.

Moreover, the Complaint actually shows the County's adherence in fact to these disclaimers that govern in law. For example, the Complaint notes the County's use of its own financial advisor, a swap advisor, and legal counsel in the

active negotiations with J.P. Morgan.   Complaint ¶¶ 23, 57, 78, 91.   There is simply no basis in the Complaint for finding a fiduciary relationship that would create a disclosure obligation.

> b.   The Complaint Shows That J.P. Morgan Complied With All Of Its Contractual Disclosure Requirements.

The Complaint actually undercuts the SEC's fraud claim for another reason: J.P. Morgan not only made all of its contractually-mandated disclosures, it even made the disclosures that the SEC contends it omitted.   The SEC complains, for example, that the Swap Confirmations listed some fee payments and not others. E.g., Complaint ¶ 57.   But the governing ISDA specifies which disclosures the parties must make, and requires no disclosures at all with respect to fees; nor do the transaction-specific Confirmations.    See, e.g., ISDA Master Agreement, Exhibit "F"; March 2003 Confirmation, Exhibit "C."   Had the County desired disclosure of all fee payments that J.P. Morgan made, it could have bargained for that disclosure – but it did not.

Yet despite the absence of an obligation to do so, J.P. Morgan actually made the disclosures that the SEC contends it did not make:  in letters that the SEC terms "side letters" (see, e.g., Complaint ¶ 58), but which are in fact part of the Confirmations.   The ISDA Master Agreement makes all "documents and other confirming evidence" part of the "Confirmation."   ISDA Master Agreement, Exhibit "F," at 1.  Thus, when the SEC concedes that J.P. Morgan disclosed a fee

26

payment in a so-called "side letter," it concedes that J.P. Morgan in fact disclosed the fee payment in the Confirmation.   Indeed, a "side letter" addressed to the County's authorized representative complied fully with the instructions that the ISDA spelled out for communicating with the County.  ISDA Master Agreement, Exhibit "F," §10.  The SEC's position would deprive the Defendants of the ability to rely upon the ISDA's contractual instructions for effectuating notice, requiring them instead to ensure that each member of the County Commission received actual notice (of facts that the Defendants were not required to disclose).   At bottom the SEC's Complaint becomes a mere "complaint" about which disclosures were made in which document – not which disclosures were never made.

### 2. The Complaint Fails To Allege A Nondisclosure Related To The Warrants.

Although the Complaint is not clear about which alleged omissions it links to which transactions (perhaps because the SEC insists that the 2003-B and 2003-C warrant issues and swaps were single transactions), with respect to the warrants the central question is the adequacy of the "official statements," the document through which the underwriter communicates with investors about the securities.  See, e.g., Complaint ¶ 39 (2002-C warrants), ¶51 (2003-B warrants), ¶76 (2003-C warrants).

In contrast to swaps, the SEC does have regulatory authority over securities, including warrants.  Standards for the contents of official statements are prescribed in Rule 15(c)2-12 of the Exchange Act (17 C.F.R. §240.15c2-12), related

interpretive guidance,[15] and MSRB Rule G-32.  The audience to whom the SEC

mandates disclosures is, of course, investors, not the issuer.[16]  <u>See id.</u>  Yet the

governing authorities do <u>not</u> mandate disclosure of all fees paid by an underwriter.

When the official statements disclosed certain fees; <u>see</u>, <u>e.g.</u>, Complaint ¶ 76; they

made more disclosure than the law requires.  Because the Complaint points to no

disclosure duty that the Defendants allegedly violated with respect to the warrants,

the antifraud claims must be dismissed as to the warrants as well.

### E.      The Complaint Fails to Allege A Material Nondisclosure.

The Complaint essentially takes materiality for granted.  In the face of the

implied nefariousness, the SEC seems to believe, it goes without saying that the

reasonable investor "would attach importance" to the alleged payments "in

determining his course of action."  <u>See</u> <u>SEC v. Merchant Capital</u>, 483 F.3d 747,

766 (11th Cir. 2007).  Of course no aspect of a claim "goes without saying" after

<u>Twombly</u> and <u>Iqbal</u>, nor in the Rule 9(b) context -- so the Court must scrutinize the

Complaint for allegations supporting the element of materiality.  <u>In re J.P. Morgan</u>

---

[15]      SEC Release No. 33-7049, 34-33741 (March 9, 1994):  Interpretive
Guidance on the Antifraud Provisions; available at c*ontent.lawyerlinks.com/
library/sec/sec_releases/33-7049.htm*.

[16]      Thus allegations that the Defendants failed to disclose to the *issuer* certain
facts related to the warrants would not establish securities fraud even if proven.
The Complaint alleges no fiduciary relationship between underwriter and issuer,
and the law imposes disclosure obligations for the benefit of the investing public.

Chase Sec. Liti., 363 F. Supp.2d at 625-26 ("materiality . . . cannot be pled in a conclusory or general fashion").

First, the Court must bear in mind that the Complaint reflects that the County, through its authorized representative, already knew about the payments. As noted above, a letter addressed to the County's authorized representative complied with the ISDA's instructions for communicating with the County.  ISDA Master Agreement, Exhibit "F," §10.  The nondisclosure of information already known to the market is not "material."  Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000); In re Andrx Corp., Inc., 296 F. Supp.2d 1356, 1366 (S.D. Fla. 2003) (citing Ganino).

Second, the Complaint never actually alleges that the County Commission would not have authorized the warrants or the swaps had the Defendants given notice of the payments in the manner that the SEC believes they should have.  The Complaint juxtaposes the supposed nondisclosures with the County Commission's votes approving the transactions in question (see, e.g., Complaint ¶¶ 37-39) – but that clever pleading strategy does no more than raise "the mere possibility of misconduct," which does not suffice to state a claim.  See Iqbal, 129 S. Ct. at 1950. The Complaint must "show," not merely "allege," that "the pleader is entitled to relief."  Id.  The SEC's failure to plead that the alleged omissions were important to the County Commission's course of action speaks volumes.

29

It is also noteworthy in this context that the County Commission – with its financial advisor, swap advisor, and legal counsel – did not demand that the swap agreements require the counterparties to disclose third-party fee payments.  See ISDA Master Agreement, Exhibit "F;" see, e.g., March 2003 Confirmation, Exhibit "C."  Had the information been important to the County Commission, or to its advisors, surely it would have demanded that disclosure.

Nor does the Complaint "show" that the reasonable investor in the warrants – not the issuer, but the potential purchaser – would attach importance to the alleged payments.  Again, broad hints of wrongdoing do not carry the day.  The Complaint alleges no impact on the terms, pricing or value of the warrants.[17]  It alleges merely that the payments "depriv[ed]" investors "of an objective and impartial bond underwriting process."  This vague and conclusory phrase is almost completely devoid of content.  It gives no hint as to the possible importance of "an objective and impartial" underlying process to the financial decision making of an investor considering the purchase of a particular security at identified terms.  The allegation does not even begin to approach the Twombly and Iqbal pleading standard, let alone that of Rule 9(b).  Because Counts One to Four of the Complaint do not adequately allege materiality, they must be dismissed.

---

[17]    The Complaint does allege that the payments increased the swap interest rates that J.P. Morgan charged the County, Complaint ¶ 6, but alleges no impact on the warrants.

**D. The Complaint Fails To Allege Fraud "In The Offer Or Sale," Or "In Connection With The Purchase Or Sale," Of A Security.**

For many of the same reasons, the Complaint also fails on the "in connection with the purchase or sale" (or, "in the offer or sale") prong of the antifraud theories.  Again the SEC places too much reliance on the atmospherics of its Complaint, and pays too little heed to the elements of its claims.  Even when a complaint alleges "bad acts" plus a securities transaction, the sum does not yield a "connection" between the two; the SEC must plead additional allegations establishing the connection.  For example, in Roanoke Technology, the Southern District of Florida dismissed the SEC's complaint for failing to establish a "connection" between the defendant's "bad acts" assisting a "pump-and-dump" scheme, and the corporation's issuance of stock.  Roanoke Tech., 2006 WL 381755, at *5.  Likewise, in this case the clever pleading that juxtaposes the conduct that the SEC disparages, on the one hand, with the contractual swap agreement and the issuance of warrants, on the other, nonetheless fails to establish a "connection" between the two.  As noted above, the Complaint never alleges that the underlying fee payments affected the County's decision whether to enter into a swap, or whether to issue warrants; nor does it allege an impact on the nature or value of the securities offerings to investors.  Accordingly, the Complaint fails on this essential prong as well, and must be dismissed.

**CONCLUSION**

For all of the foregoing reasons, the Court should grant Mr. LeCroy's

Motion to Dismiss the Complaint:

- under Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction over the swaps (Counts One-Three);

- under Rule 12(b)(6), to dismiss the claims for injunctive relief because (a) the limitations period has expired, and (b) the Complaint fails to allege a valid claim for injunctive relief (Counts One-Five); and

- under Rule 12(b)(6), for failure to allege a violation of the antifraud statutes and MSRB Rules (Counts One-Four).

Respectfully submitted,

/s/_____
Lisa A. Mathewson, Esquire
The Law Offices of Lisa A. Mathewson, LLC
123 South Broad Street, Suite 810
Philadelphia, PA 19109
(215) 399-9592 (phone)
(215) 600-2734 (fax)
lam@mathewson-law.com
Pennsylvania Bar No. 77137

Robert E. Welsh, Jr., Esquire
Welsh & Recker, P.C.
2000 Market Street, Suite 2903
(215) 972-6430 (phone)
(215) 972-6436 (fax)
rewelsh@welshrecker.com
Philadelphia, PA 19103

*Counsel for Defendant Charles LeCroy*

January 19, 2010

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2010 I caused a copy of the Unopposed

Motion of Lisa A. Mathewson for Admission *Pro Hac Vice* to be served upon the

following via electronic filing and first-class mail:

Robert Levenson, Esquire
Jason Berkowitz, Esquire
Securities and Exchange Commission
801 Brickell Avenue
Suite 1800
Miami, FL 33131

*Attorneys for Plaintiff Securities and Exchange Commission*

Richard F. Lawler, Esquire
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166

W. Percy Badham III, Esquire
Badham & Buck, LLC
2585 Wachovia Tower
420 20th Street North
Birmingham, AL 35203

*Attorneys for Defendant Douglas W. MacFaddin*


/s/ _____
Lisa A. Mathewson

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

SECURITIES AND EXCHANGE        :
COMMISSION                     :
                               :
            v.                 :
                               :
CHARLES E. LeCROY and          :
DOUGLAS W. MacFADDIN           :        2:09-cv-2238-AKK


**INDEX OF EXHIBITS TO MOTION TO DISMISS OF CHARLES LeCROY**


Exhibit "A" - Brief of *Amicus Curiae* SIMFA, August 7, 2008


Exhibit "B" - Reply Brief of *Amicus Curiae* SIMFA, September 9, 2008


Exhibit "C" - Initial Confirmation of the March 28, 2003 Swap


Exhibit "D" - March 12, 2003 Presentation Regarding the Sewer Operation Fund to Standard & Poor's


Exhibit "E" - Order Granting Partial Summary Disposition to the Division of Enforcement, Admin. Proc. 3-12359, Rulings Release No. 630 (October 18, 2006)


Exhibit "F" - ISDA Master Agreement